STATE v. BARNEY CUNNINGHAM.

[59 South. 76.]

1. STATES. *Power.   Agreements.   Congressional consent.   Constitution* 1890, *section* 26.

 States are sovereigns and may enter into any compact or agreement they see fit with each other except as prohibited by section 10 of article 1 of the Constitution of the United States, forbidding such agreement without the consent of congress, but such consent may be manifested by resolution as well as by formal act.

2. CONGRESS OF THE UNITED STATES. *Power.   States.   Jurisdiction. Boundary.*

 Under joint resolution No. 5 of Congress approved January 26, 1909, vol. 35, U. S. Stat. at Large, page 1161, giving its consent that the states of Mississippi and Arkansas could agree upon a boundary line and settle the jurisdiction to be exercised by each over the Mississippi river, these states were given absolute and complete power to agree to such jurisdiction and chapter 141 of the Laws of Mississippi 1910 accepting an agreement proposed by an act of the state of Arkansas, Laws 1909, page 889, extending the criminal jurisdiction of Mississippi to the Arkansas bank of the

Mississippi river, and agreeing that the two states should have concurrent jurisdiction over such river, was authorized by such resolution and congress was invested with the power to pass such resolution.

3. SAME.

By virtue of such resolution of congress and the acts of the legislatures of Arkansas and Mississippi, each state became empowered to exercise criminal jurisdiction over the waters of the Mississippi river as to all crimes or misdemeanors and to make and enforce its own laws in respect thereto.

4. SAME.

By virtue of said resolution of congress and said legislative acts of the two states, Mississippi may prohibit the sale of intoxicating liquors upon the waters of the Mississippi river and punish their violation at all points of the river covered by the agreement.

5. SAME.

But neither state can conduct a prosecution against any person for the doing of a thing upon the waters of the river which constitutes a crime only under the laws of the other state.

6. SAME.

Where the offense is a violation of the laws of both states, the two states have concurrent jurisdiction and the state first acquiring jurisdiction must conduct the prosecution to its final termination.

7. CONSTITUTION 1890, SECTION 26. *Laws* 1910, *chapter* 141. *Criminal jurisdiction.*

Section 26 of the Constitution of 1890 guaranteeing to each person a trial in the county where the offense is committed is not violated by chapter 141 of the Laws of Mississippi 1910, authorizing the prosecution of an offense on the waters of the Mississippi river on the Arkansas side, because by this act, the counties of Mississippi, lying immediately on the Mississippi river are extended, so as to give them criminal jurisdiction within the territory embraced by extending their boundary line in a continuous and direct course to the extreme western bank of the river where it touches the Arkansas side.

APPEAL from the circuit court of Tunica county.

HON. SAM COOK, Judge.

Barney Cunningham was acquitted of unlawful retailing and the state appeals.

The facts are fully stated in the opinion of the court.

*Frank Johnston,* assistant attorney-general, for state.

*Frank A. Montgomery,* for appellee.

No brief of counsel on either side found in the record.

MAYES, C. J., delivered the opinion of the court.

This appeal is prosecuted by the state, and the record presents an interesting and important question for solution. The record from which the state prosecutes this appeal discloses the fact that at the October term, 1911, of the circuit court of Tunica county, Barney Cunningham was indicted for the unlawful sale of intoxicating liquors on the 16th day of October, 1911. The indictment was returned by the grand jury of Tunica county, and charges the sale to have been made "within the jurisdiction of the circuit court of Tunica county, and against the peace and dignity of the state of Mississippi." A jury was waived, and the trial was had before the distinguished trial judge sitting as judge and jury. The case was submitted on an agreed statement of facts, which we set out in full. The facts are as follows:

"On the 16th day of October, 1911, the defendant, Barney Cunningham, a citizen of Helena, Ark., leased a certain barroom on the steamer Zera, Jr., a ferryboat, plying between Helena, Ark., and Trotters Point, in Tunica county, in the state of Mississippi, immediately opposite the said city of Helena; that on that day on said boat in the Mississippi river, and in that part of it which is in the state of Arkansas, in Phillips county, to wit, west of the center or thread of the stream of the said Mississippi river, due west of Tunica county, Miss., the said Barney Cunningham did sell vinous, spirituous, and malt liquors in less quantities than one gallon, to wit, to John Doe and Richard Rowe, and others. It is also admitted that at the time of such sale the said Bar-

ney Cunningham did not have any license from Phillips
county, Ark., to sell any whisky at any point in the said
Mississippi river; that when the said boat lands at Hel-
ena, Ark., the bar is closed, and no sales are made at
the Arkansas bank or at the Mississippi bank."

We may state here that any sale of intoxicating li-
quors in the state of Mississippi, at any place within
its jurisdictional limits, is a violation of the state laws.

The agreed facts admit that Barney Cunningham did
sell intoxicating liquors on a ferryboat floating on the
waters of the Mississippi river, but on the Arkansas side
in front and due west of Tunica county, Miss. The learned
trial judge held Cunningham not guilty and discharged
him from custody, and from this judgment an appeal is
prosecuted.   The basis for this prosecution on the part
of the state of Mississippi is found in a resolution of
Congress in volume 35, pt. 1, p. 1161, U. S. Statutes at
Large.   This resolution was passed and approved on the
26th day of January, 1909, and is entitled a "joint reso-
lution to enable the states of Mississippi and Arkansas
to agree upon a boundary line and to determine the juris-
diction of crimes committed on the Mississippi river and
adjacent territory."   We shall deal with the body of
this resolution later.   Immediately upon the passage of
this resolution by congress, and on May 31, 1909, the leg-
islature of the state of Arkansas, by number 290, p. 888,
of the Laws of Arkansas, passed an act entitled: "An
act to extend the criminal jurisdiction of the state of
Arkansas to the east bank of the Mississippi river."

The above act extended the criminal jurisdiction of
the state of Arkansas over the waters of the Mississippi
river to the shore line of the river on the Mississippi
side, and the Arkansas act was to become effective when
the state of Mississippi adopted its provisions by ex-
tending the jurisdiction of this state over the same ter-
ritory of the shore line of Arkansas.   The state of Mis-
sissippi accepted the provisions of the Arkansas act

when its legislature passed chapter 141, Laws 1910, p. 132, entitled: "An act to extend the criminal jurisdiction of the state of Mississippi to the west bank of the Mississippi river, and giving the state of Arkansas concurrent jurisdiction with Mississippi over certain territory." We shall have occasion to refer to the specific provisions of all these acts further on in this opinion.

It is seen from an inspection of the resolution referred to above that the Congress of the United States has given these two states the power "to enter into such agreement or compact as they may deem desirable or necessary, not in conflict with the Constitution of the United States, etc., to fix the boundary line between the said states, etc., and also to adjudge and settle the jurisdiction to be exercised by said states, respectively, over offenses arising out of the violation of the laws of said states upon the waters of the Mississippi river." Language could frame no more plenary power to fix the jurisdiction over offenses on the river than is conferred upon these states by the resolution. Each state has accepted this grant of power by the acts of the legislature above referred to, and each state has entered into a compact with the other that the jurisdiction of each over criminal offenses shall extend from shore to shore on the waters of the river. The cession of this jurisdiction by the two states does not necessarily mean a cession of sovereignty. The cession of jurisdiction over criminal offenses on the river may have been used in a more restricted sense, but we are not now concerned with that question. The question now is, Can Congress authorize such a compact to be made between the states? Can the states themselves, being authorized so to do by Congress, make any such compact? Does the resolution of Congress authorize the states to make the compact that they have entered into?

In the case of *In re Mattson* (C. C.), 69 Fed. 535, which case is quoted with approval by the Supreme Court of the United States in *Nielsen* v. *State of Oregon,* 212 U.

S. 315, 29 Sup. Ct. 383, 53 L. Ed. 528, the court said: "Concurrent jurisdiction between states separated by navigable rivers is an established rule in this government, although in some instances the entire river is within the territorial limits of one state; and in some cases jurisdiction is limited to the execution of the civil and criminal process of each state upon the adjacent waters within the exclusive jurisdiction of the other. Act June 28, 1834, ch. 126; 4 Stat. 708 (approving compact between New York and New Jersey). Concurrent jurisdiction is a practical necessity in the administration of government over such rivers."

States are sovereigns and may enter into any compact or agreement they see fit with each other except as prohibited by section 10 of article 1 of the Constitution of the United States. This section provides that "no state shall, without the consent of Congress, enter into any agreement or compact with another state," etc. (We shall not undertake to discuss whether or not there is a limitation on the kind and character of agreements or compacts which states may enter into, even when they have the consent of Congress, for that is not before us, but the question here is whether the particular compact which the states of Arkansas and Mississippi did enter into was assented to by Congress, and, if so, was it one which they had the power to agree upon?

The resolution of Congress was approved on January 26, 1909, and is found in volume 35, p. 1161, U. S. Stat. at Large, and is in full as follows, viz.: "That the consent of the Congress of the United States is hereby given to the states of Mississippi and Arkansas to enter into such agreement or compact as they may deem desirable or necessary, not in conflict with the Constitution of the United States, or any law thereof, to fix the boundary line between said states, where the Mississippi river now or formerly, formed the said boundary line and to cede respectively each to the other such tracts or parcels

of the territory of each state as may have become sep-arated from the main body thereof by changes in the course or channel of the Mississippi river and also to adjudge and settle the jurisdiction to be exercised by said states, respectively, over offenses arising out of the vio-lation of the laws of said states upon the waters of the Mississippi river.''

It can make no difference that the consent of Congress is manifested by a resolution, and not a formal act. In order for states to make agreements and compacts with each other they only need the consent of Congress, and this consent may be manifested as well by resolution as by formal act. The Constitution of the United States requires no particular manner of giving consent. *Green* v. *Biddle*, 8 Wheat. 1, 5 L. Ed. 547. The resolution gives to the states named the most complete power to enter into any agreement or compact they may deem ''desir-able or necessary,'' which does not conflict with the Con-stitution of the United States or any law thereof. It gives them authority not only to fix *the boundary line between them,* but it gives them full and complete power *to adjudge* and settle ''the jurisdiction to be exercised by said states, respectively, over offenses arising out of a violation of the laws of said *states* upon the waters of the Mississippi river.''

It is argued that because the resolution allows the states to fix the boundary line and ''adjudge and settle the jurisdiction to be exercised by said states, respect-ively, over offenses,'' etc., that the resolution of Con-gress is exclusive of the idea that any concurrent juris-diction may be agreed to by the states over the waters of the river. It is argued that the states must fix the boundary and then each confine its jurisdiction over the waters to the boundary as agreed upon. We think this interpretation of the resolution is too narrow. The agreement which the states make as to the boundary line does not affect their right under the resolution ''to ad-

judge and settle the jurisdiction to be exercised by said states over offenses arising out of the violation of the laws of said states upon the waters of the Mississippi river.'' These states may make their criminal jurisdiction over the waters follow the boundary line agreed upon, or they may agree to make the criminal jurisdiction of each extend over the waters, concurrently, from shore to shore.

When the three sovereign powers give their consent, there is no other power to object; there being nothing in the Constitution of the United States and nothing in the Constitutions of the states to prevent it. In other words, under this resolution absolute powers is given to these states to settle their boundary line, and to adjudge what jurisdiction the states may exercise as to violations of the laws of the respective states upon the waters of the Mississippi river. As we have seen above, both Arkansas and Mississippi accepted the powers conferred by the resolution of Congress. The state of Arkansas was the first to act, and on May 31, 1909, passed the following act, the title to which has already been given, viz.: ''Whereas, the criminal jurisdiction of the state of Arkansas only extends to and follows the meanders of the west bank of the Mississippi river, and whereas, there are numerous crimes committed on the Mississippi river over which Arkansas and her sister states on the east bank of said river have no criminal jurisdiction, and it is almost impossible to bring criminals operating along either bank of said river to justice.''

After the above recitation it is provided by section 1 that the criminal jurisdiction of the state of Arkansas be extended to the east bank, which is the Mississippi side, of the Mississippi river to the full extent of the frontage of Arkansas on the Mississippi river.

Section 2 provides that ''the state of Arkansas and her sister states, Tennessee and Mississippi, have concurrent criminal jurisdiction over the parts of said ter-

ritory lying opposite them and between the lines extend-
ing and parallel to their north and south boundaries.''

Section 3 provides ''that this act be in force when the
said states of Tennessee and Mississippi, or either of
them, pass a similar act governing the territory de-
scribed in this act, opposite them and between their said
north and south boundaries.'' See Acts of Arkansas of
1909, p. 889.

On the 12th day of April, 1910, the state of Mississippi
passed an act accepting the agreement proposed by the
act of the Arkansas Legislature; the Mississippi statute
being chapter 141, p. 132, Laws of 1910, the title to which
we have already set out in full. The Mississippi act re-
cites the resolution of Congress and the passage of the
act of 1909 by the state of Arkansas. Section 1 of the
act then extends the criminal jurisdiction of Mississippi
to the banks of the Mississippi river on the Arkansas
side. Section 2 gives to each state concurrent criminal
jurisdiction over the Mississippi river, whether the of-
fense be committed on the Mississippi or the Arkansas
side. Section 3 of the act then provides ''that the coun-
ties of Mississippi lying immediately on the Mississippi
river shall, respectively, have and possess criminal juris-
diction within the territory embraced by extending their
boundary lines which strike said river on a continuous
and direct course to the extreme western bank of said
river.'' We have not given a detailed statement of the
Mississippi act, but in substance it is as above.

From the above it is plain to be seen that the states
have construed the resolution of Congress to give them
absolute power to enter into this compact as to the crim-
inal jurisdiction that each may exercise over the waters
of the river, and this without reference to the additional
power given by the resolution to fix the boundary line.
In the belief that this power to fix the criminal jurisdic-
tion which the states may exercise over the waters, each
has ceded to the other the power to extend its criminal

jurisdiction from bank to bank, and the states have for-
mally entered into this compact. There is no contest be-
tween the states themselves, no question of conflict be-
tween them, because each has ceded to the other the full-
est jurisdiction. The question here is solely as to the
power of the states, under the resolution, to enter into
this compact or agreement. This controversy also differs
from many other controversies of this character in that
in the case at bar the compact was not made by Con-
gress for the states, as is to be found in many cases
where Congress, in creating the territory out of which
the states are made, gives to the states at the date of
their creation concurrent jurisdiction over rivers form-
ing a boundary between the states. But in this case
the states are given consent by Congress to make such
agreement as they may deem necessary or desirable, and
the states themselves have made this compact and are
standing by it. It is their own deliberate act. In this
case there can be no conflict between the states so long
as each stands by its own agreement.

The exercise of concurrent criminal jurisdiction over
the waters which form the boundaries of states, even to
the very borders of each state, is not new to the law or
to congressional legislation. It seems to be favored and
not opposed by Congress, and, in creating territories
and states, it has been voluntarily inserted in the creat-
ing acts of Congress and forced upon many states. When
the territories of Washington and Oregon were organ-
ized concurrent jurisdiction was given to each over all
offenses committed on the Columbia river where said
river forms a common boundary. See Act March 2,
1853, ch. 90, 10 U. S. Stat. 172; 11 U. S. Stat. 383. The
same is true of the states of Minnesota and Wisconsin
(Act Aug. 6, 1846, ch. 89, 9 U. S. Stat. 57); the same
of Iowa and Illinois (Act March 3, 1845, ch. 48, 5 U. S.
Stat. 742), and Kentucky and Missouri.

It is needless to cite authorities to sustain the proposi-
tion that Congress had the power to authorize these

states to enter into a compact to exercise concurrent jurisdiction over these waters. If it could authorize it as an incident to the creation of the territory and force it upon states without the states' consent, it could certainly afterwards assent to it when the interested states asked for it.

We think that the case of *Central Railroad Co.* v. *Jersey City,* 209 U. S. 473, 28 Sup. Ct. 592, 52 L. Ed. 896, is conclusive of the proposition that states having a river forming a common boundary may, with the consent of Congress, fix the jurisdiction to be exercised over the waters from one state to the very borders of the other, irrespective of the boundary line between the two states for other purposes. If one state may grant to another exclusive jurisdiction over the waters to its banks for any purpose, when Congress consents, we cannot understand why the same states may not grant to each other concurrent jurisdiction each to the banks of the other over offenses committed on the waters which may constitute a violation of the laws of the state undertaking the prosecution, whether such offense be *malum prohibitum* or *malum in se.*

In the case of *Nielsen* v. *State of Oregon,* 212 U. S. 315, 29 Sup. Ct. 383, 53 L. Ed. 528, it appears that Nielsen was convicted in the justice of the peace court in the state of Oregon for maintaining and operating a purse net on the Columbia river for the purposing of catching fish, contrary to the statutes of Oregon. It appears that this case was before the court on agreed facts. Under an act of Congress creating the territories of Washington and Oregon, it was provided (section 21) that "the territory of Oregon and territory of Washington shall have concurrent jurisdiction over all offenses committed on the Columbia river where such river forms a common boundary between said territories." Nielsen was a resident of the state of Washington and had obtained a license from the fish commissioner of Washington to op-

erate the net on the Columbia river. When arrested, he was on the river in the limits of the state of Washington operating the net. He was convicted and prosecuted an appeal to the Supreme Court of the state of Oregon, and was there again convicted and appealed to the United States Supreme Court. Under the laws of Oregon, the use of the net was prohibited and was punishable as a misdemeanor. The court held in that case that "concurrent jurisdiction, properly so called, on rivers, is familiar to our legislation, and means the jurisdiction of two powers over one and the same place." The court further stated: "Undoubtedly one purpose, perhaps the primary purpose, in the grant of concurrent jurisdiction, was to avoid any nice question as to whether a criminal act sought to be prosecuted was committed on one side or the other of the exact boundary in the channel, that boundary sometimes changing by reason of the shifting of the channel. Where an act is *malum in se,* prohibited and punishable by the laws of both states, the one first acquiring jurisdiction of the person may prosecute the offense, and its judgment is a finality in both states, so that one convicted or acquitted in the courts of the one state cannot be prosecuted for the same offense in the courts of the other. But, as appears from the quotation we have just made, it is not limited to this. It extends to civil as well as criminal matters and is broadly a grant of jurisdiction to each of the states. The present case is not one of the prosecution for an offense *malum in se,* but for one simply *malum prohibitum.* Doubtless the same rule would apply if the act were prohibited by each state separately, but, where as here the act is prohibited by one state and in terms authorized by the other, can the one state which prohibits prosecute and punish for the act done within the territorial limits of the other? Obviously the grant of concurrent jurisdiction may bring up, and from time to time, many and some curious and difficult questions, so we promptly con-

fine ourselves to the precise question presented. The plaintiff in error was within the limits of the state of Washington doing an act which that state in terms authorized and gave him a license to do. Can the state of Oregon, by virtue of its concurrent jurisdiction, disregard that authority, practically override the legislation of Washington, and punish a man for doing within the territorial limits of Washington an act which that state had specially authorized him to do? We are of opinion that it cannot. It is not at all impossible that, in some instances, the interests of the two states may be different. Certainly, as appears in the present case, the opinion of the legislatures of the two states is different, and the one state cannot enforce its opinion against that of the other, at least as to an act done within the limits of that other state.''

There is this distinction in the case just quoted from and the case we are now considering. In the first place, the compact was forced on the states by Congress, and the states had made no agreement whatever; the laws of the two states were conflicting, and one of the states was trying to punish the inhabitant of the other for the doing of a thing on the waters of the river which was expressly allowed by the state of his residence. In this conflict between the states, without any compact or agreement voluntarily entered into between them fixing and granting jurisdiction each to the other, the courts were called upon to settle these hostile assertions of sovereignty and define the extent of power each state had under this grant of concurrent jurisdiction by Congress.

In this case the states have agreed as to jurisdiction, and there is no conflict of authority between them. The states of Washington and Oregon had another distpute, as is shown by the case of *State of Washington* v. *Oregon,* 214 U. S. 205, 29 Sup. Ct. 631, 53 L. Ed. 969. This last case involved only the boundaries between them, and Justice BREWER, rendering the opinion of the court in the

Nielsen case and in the later case of *Washington* v. *Oregon,* in concluding the opinion in the latter case, refers to the resolution of Congress giving to the states of Mississippi and Arkansas the right to agree upon a boundary line and determine the jurisdiction of crimes committed on the Mississippi river, and says: "We may be pardoned if, in closing this opinion, we refer to this resolution. Similar ones have passed Congress with reference to boundaries between Mississippi and Louisiana and Tennessee and Arkansas. We submit to the states of Washington and Oregon whether it will not be wise for them to pursue the same course, and, with the consent of Congress and through the aid of commissioners, adjust, as far as possible, the present appropriate boundaries between the two states and their respective jurisdiction." The last case is dealing only with the boundaries of the states and was a civil litigation between the states of Washington and Oregon to determine the boundary line, but the reference by Justice BREWER to this resolution which we are now considering shows that he considered that Congress had full power to authorize and give its consent, and that then the states had full power to act upon this consent and fix the matters of dispute as to their boundary or jurisdiction.

The case of *Lemore* v. *Commonwealth,* 127 Ky. 480, 105 S. W. 930, is a case directly in point. It appears that Lemore was indicted for violating the local option laws in Fulton county, Kentucky. The proof on the trial showed that Lemore was the owner of a gasoline boat running between Hickman, Kentucky, and New Madrid, Mo., on the Mississippi river. It appears that one William Sutberry got on the boat at Mabel, in Fulton county, Kentucky, and, after it had pulled out and was near the Missouri side, he bought a quart of whisky from Lemore. It also appears that by an Act of Congress of March 6, 1820, ch. 22, 3 Stat. at Large, p. 545, while the middle of the main channel of the Mississippi river is the

boundary between Kentucky and Missouri, both states are given concurrent jurisdiction over it. Lemore was indicted, tried and convicted, and appealed to the Supreme Court of Kentucky. The Supreme Court sustained the conviction on several grounds, and among other things said: "While by the act of Congress the middle of the main channel of the Mississippi river is the boundary between Kentucky and Missouri, both states are given concurrent jurisdiction over it." Act of Congress March 6, 1820, ch. 22, 3 Stat. 545.

In *State* v. *Mullen,* 35 Iowa, 199, it appears that by the act of Congress (see 5 U. S. Stat. at Large, 742) admitting the state of Iowa it was provided that "the state of Iowa shall have concurrent jurisdiction on the river Mississippi, and over other rivers bordering on said state of Iowa, so far as the said rivers shall form a common boundary between said state and any other state or states now or hereafter to be formed, bounded by the same."

In the above case one Mullen was indicted and convicted of keeping a house of ill fame on a boat resorted to for the purpose of prostitution and lewdness. The boat in question came up the Mississippi river, and for several months prior to the finding of the indictment had been resting on the ground on the east side of an island east of the main channel of the river. The boat had been run in for repairs, and was left grounded by the receding waters, though at times it was afloat. When the arrest was made, it is conceded that the boat was on the Illinois side of the river, and the point was made on the trial of the case that no prosecution could take place in the state of Iowa. The Iowa Supreme Court, among other things said: "Does this jurisdiction exist under the facts therein stated? In other words, does the fact that the boat at the time of indictment and of trial was on the east side of the main channel of the river, resting temporarily in the rear of the island, because the

water had receded from it, or for repairs, take it out of the jurisdiction of this state? It seems to us clearly that it does not. In the eye of the law, a crime committed on the boat under the circumstances stated is as much an offense perpetrated on the river as though the vessel were at the time afloat. If it is not so, it follows that, if a vessel navigating the Mississippi river should run aground east of the middle of the main channel, and the water should recede, leaving it upon the ground temporarily, the state of Iowa would have no jurisdiction over a crime committed upon it under such circumstances, and hence would arise the question so difficult of determination, and which it was the purpose of the act of Congress above cited to avoid, whether the act in question was committed one foot east or one foot west of the medium *filum aquae*. Further it is claimed that the boundary of Lee county on the east is coextensive with that of the state, which is the middle of the main channel of the Mississippi river, and that the local jurisdiction of the district court is of offenses committed in the county in which it is held, and that the district court has no jurisdiction to try an offense committed without the boundary of the county, to wit, east of the middle of the main channel of the Mississippi river. If this be true, it amounts to this: That Congress has conferred upon the state, and the state, by positive statute, has assumed a jurisdiction which it has vested in no court, and for which it has provided no means of making effective. That the state possesses a jurisdiction which is vested in no department of the government is a proposition which involves a contradiction. But general jurisdiction for the trial of crimes is vested nowhere unless it be in the district court. Congress having granted to the state of Iowa jurisdiction concurrent with the state of Illinois over the Mississippi river, jurisdiction over so much of the river as lies opposite to any county on the eastern boundary of the state must attach to such county as an

incident of its organization. For it is only through the medium of county organizations that this jurisdiction can be rendered availing, and it is a familiar doctrine that the grant of a right or power carries with it as an incident every thing necessary to make the power or right effective. A cognate question to the one now under consideration arose in *Mahler* v. *Transportation Co.,* 35 N. Y. 352. In that case it was suggested that, if the state of New York owned to the center of Long Island Sound, that portion covered by water was not divided into counties. But the court said: 'We think there is no force in the suggestion. Even if the statute in declaring the bounds of the counties bordering on the sound had limited them, in terms, to the line of low water, it would indicate nothing but the mere fact that the legislature deemed their extension to the exterior water line of the state as a matter of no practical importance.' And it was held that, whether the actual boundaries of the counties did or did not extend beyond the low-water mark, still such counties comprehended within their jurisdiction the water between their respective shores and the water line of the state, to-wit, the water lying beyond their actual boundaries, but within the jurisdictional line of the state. And the court said: 'This is the usual and reasonable rule in the political apportionment of territory for the purpose of fixing the limits of civil and criminal jurisdiction.' . . . It is claimed that to allow the officers of the state to seize this boat would work an invasion of the sovereignty of the state of Illinois. If the defendant may be tried by the court of this state for an act done upon the boat, it must follow that the officers of this state may arrest him upon the boat for the purpose of bringing him before the court for trial. It would be inconsistent to say that the *locus* of a crime is within the jurisdiction of a court for the trial of an offense, and yet beyond it for the arrest of the offender. If the officers of this state may lawfully go upon

the boat for the arrest of the defendant, why may they not lawfully do so for the seizure of the boat itself? If one is not an invasion of the sovereignty of the state of Illinois, why is the other?''

In the case of· *State* v. *George,* 60 Minn. 503, 63 N. W. 100, it appears that the states of Minnesota and Wisconsin have concurrent jurisdiction over the Mississippi river just as in this case. It appears in the above case that one George was indicted for the crime of larceny in Minnesota and was tried and convicted. The facts show that George committed the crime on a bridge which at Winona, Minn., spans the Mississippi river to the Wisconsin side. The crime was committed upon that part of the bridge which is built upon an island in the river on the Wisconsin side. The waters between the island and the Wisconsin side of the river were not used for navigation, and the question was: Had the Minnesota court jurisdiction to try, hear, and determine the offense charged? It was contended that the Minnesota court had no jurisdiction, and the court said: ''It is provided by chapter 70, Gen. Laws 1889, that this concurrent jurisdiction shall be exercised by the courts sitting in the counties bordering on the river, and for this purpose the part of the river bordering on each county is attached to that county. Some of the purposes of this concurrent jurisdiction are to enforce proper police regulations on the river, and to regulate and protect interstate traffic on and across the river, and the persons engaged in the same. If public travel across the river at this point was carried on by means of a ferryboat, there is no question but that this concurrent jurisdiction would attach during the transit across the river. The fact that the appliance by means of which the travel is carried on is a bridge instead of a ferryboat does not change the rule. The question here involved is not whether the courts of Minnesota have jurisdiction over this permanent structure on this island considered as real estate, but whether

Minnesota and her courts have jurisdiction over the persons and moving or movable vehicles and things on this bridge. In our opinion it is not material whether, at the time of the occurrence, such persons happen to be over the water of the river, or over an island in the river, or at one side of the main channel or the other. One of the reasons for establishing this concurrent jurisdiction was to prevent the escape of criminal on account of the uncertainty that so frequently arises as to whether the act was committed on one side of the middle of the main channel or the other side of it. This uncertainty exists just as well when the act is committed on a bridge as when committed on a water craft. A traveler on such a bridge is usually not likely to know whether he is over an island or over the water, or on one side of the main channel or the other. In our opinion the court below had jurisdiction.''

A very full and interesting discussion of the questions involved in this case is to be found in Rorer on Interstate Law, p. 438, *et seq.* It is there said: ''The existence of concurrent jurisdiction in two states over a river that is a common boundary between them vests in each of such states, and in the courts thereof, jurisdiction, both civil and criminal, from shore to shore, of all matters of rightful state cognizance occurring upon such river in all parts thereof where it forms such common boundary. Such concurrent jurisdiction obviates the difficulty in judicial proceedings of ascertaining upon which side of the main channel of a boundary river ocurrences have transpired or crimes have been committed.''

The above authority also states the rule to be that, where two states have concurrent jurisdiction, the court which first gets actual jurisdiction of the cause is entitled to hold same to a final determination, and that neither party can be forced into a different jurisdiction upon the same subject-matter of litigation unless the case be of a character that is removable to the United States

courts, and a full and final adjudication upon the merits by either court of concurrent jurisdiction is conclusive and a bar in all courts wherein the same subject comes judicially in question. The concurrent jurisdiction is conferred upon the states to be exercised over the waters and for the purpose of enforcing its own laws and not the laws of the other state. One state cannot, of course, enforce the laws of another state, and no such authority is intended to be conferred either by Congress or the compact of the states. On this subject Mr. Rorer says: ''This must be the result not only as to the practical administration thereof in its courts, but also as to the measure of culpability or criminality and punishment. Upon general principles not even an arrest may be made except for the alleged violation of law, and that law must needs be the law of the state whose tribunals and officers make the arrest except in cases of extradition. Thus in the course of things it must happen that the offense charged occurred beyond the main channel of the river. Technically this is in the territorial limits of the opposite state, and yet arrest and punishment is made and enforced under the laws of a different state than that in whose actual territorial limits the crime was committed." Again Mr Rorer says that this concurrent jurisdiction "is given over the river and not of the laws of the abutting states. Each state is left to administer its own laws." See, also, *Ex parte Mattson* (C. C.), 69 Fed. 535.

Under the resolution of Congress and under the compact between the states of Mississippi and Arkansas, the fullest jurisdiction is granted to each state to exercise criminal jurisdiction over the waters of the Mississippi river; each state making and executing its own laws. This criminal jurisdiction extends to all kinds of crimes, both *malum in se* and *malum prohibitum*. Each state has a right to determine for itself what it shall constitute as a crime within its jurisdiction, and if these things are done on the waters of the river, it may punish in

its own courts for the doing of the things, on the waters of the river, which are denounced by its laws, whether the other state has the same law or not. The jurisdiction given to the states enables them to legislate as to what shall constitute a crime in its jurisdiction, as well as to conduct prosecutions in its courts for crimes which were such at the date of the compact between the states.

On the other hand, neither state can conduct a prosecution against any person for the doing of a thing upon the waters of the river which constitutes a crime only under the laws of the other state. Each state must conduct its prosecutions for such crimes as are denounced by its own laws, and, in case the act is a crime in both states, then the state first acquiring jurisdiction shall conduct the prosecution to its final termination, and when the prosecution is so conducted it is a bar to any further proceedings in the courts of the other state, even though the punishment may be different in each state. Concurrent jurisdiction of this character cannot be given to sovereign states without its perplexities and confusion, but we think the authorities are all in accord with the rule of law as we now announce it.

In this case Arkansas and Mississippi have agreed that the jurisdiction of these two states over offenses committed on the waters of the river shall extend from shore to shore, and, whether the sale of whisky in Arkansas is prohibited or not, the state of Mississipi has the right to prohibit the sale on the waters of the Mississippi and to punish for a violation of its laws anywhere upon this river covered by the compact, at least until Arkansas withdraws its consent to this agreement, if this can be done without the mutual consent of both states and of Congress, but we have no concern with this question at this time.

But it is argued that section 26 of the constitution of the state of Mississippi guarantees to each person "a speedy and public trial by an impartial jury of the coun-

ty where the offense was committed," and that to allow
this prosecution to proceed in the state of Mississippi,
when the offense was committed in Arkansas, would be
violative of the constitution by allowing the state to pros-
ecute in a county other than the one in which the offense
was committed. The answer to this argument is that
the act of 1910 expressly extends the counties of Mis-
sissippi, lying immediately on the Mississippi river, so
as to give them criminal jurisdiction within the terrtory
embraced by extendng their boundary lines in a contin-
uous and direct course to the extreme western bank of
said river where it touches the state of Arkansas. In
other words, the county limit is coextensive, immediately
in front of it, with the jurisdiction given to the state of
Mississippi, in so far as these prosecutions are con-
cerned. The state has the power to extend its county
lines as far as it deemed desirable, without any right in
any subsequent criminal to complain. The state is pros-
ecuting in its own name for an offense committed within
its jurisdiction and within the jurisdiction of the county
where the offense was committed.

It is our judgment that the learned judge of the trial
court was in error when he rendered a judgment acquit-
ting appellee, and the judgment of the court is reversed,
and hereafter prosecutions for a violation of the state
laws of the territory of the Mississippi river, included
within the compact between this state and Arkansas, will
be conducted in accordance with this opinion.

*Reversed.*

Cook, J. (concurring).

The writer happened to be the trial judge in the court
below, and the judgment rendered by the trial judge is
here reversed. Without assigning reasons why, as trial
judge, one conclusion was reached, and quite another
conclusion is now reached as an appellate judge, I desire
to specially concur in the unanswerable logic of the chief
justice which, in my opinion, is amply supported by the
authorities and correctly announces the law of this case.