STATE OF NEW JERSEY v. DONALD FEDERANKO,
DEFENDANT-APPELLANT.

Argued January 20, 1958—Decided February 17, 1958.

*Mr. James G. Aiken,* Deputy Attorney-General, assigned as Acting Prosecutor of Salem County, argued the cause for the State of New Jersey (*Mr. Grover C. Richman, Jr.,* Attorney-General).

*Mr. William Hermann* argued the cause for the defendant-appellant (*Mr. William B. Knight,* attorney).

The opinion of the court was delivered by

FRANCIS, J.    ■    On January 9, 1957 an accusation was filed in the County Court of Salem County against the defendant Donald Federanko, charging him with gambling in violation of *N. J. S.* 2*A*:112–1.    More specifically, the offense was alleged to have been committed "in and upon the waters of the Delaware River, and upon the eastern half of said Delaware River, in the County of Salem, and State of New Jersey, to wit:   on premises known as 'Penns-

grove Pier,' extending from the end of West Main Street, in the Borough of Pennsgrove, County of Salem, and State of New Jersey." Indictment and trial by jury were waived and on January 18, 1957 a plea of *non vult* was entered. Defendant was then given a suspended six months' county jail sentence and was placed on probation for two years subject to certain conditions, among them the payment of a $500 fine. Subsequently a motion was made to vacate the judgment of conviction on the grounds (1) that no offense was committed against the State of New Jersey because the act took place on the Delaware River within the State of Delaware, and (2) that the County Court of Salem County had no jurisdiction since that *locus* was beyond the boundary lines of the county. Denial of the motion was followed by an appeal to the Appellate Division of the Superior Court which was brought to this court on our own motion.

Almost from the beginning of their statehood down to 1935, New Jersey and Delaware had engaged in a boundary dispute involving title to the bed, or subaqueous soil, of the Delaware River. The phase of the controversy which is pertinent in the present case involved that territory within a circle of 12 miles about the town of New Castle. Delaware claimed ownership of the entire bed of the river within the limits of this circle up to the low water mark on the east or New Jersey side. New Jersey claimed to be the owner up to the middle of the channel.

In 1877 litigation was instituted in the United States Supreme Court by New Jersey to enjoin the exercise by Delaware of its asserted right to enforce certain statutes relating to fisheries in the river. In 1905, for the purpose of settling the conflict of jurisdiction, a compact was executed, *L.* 1905, *c.* 42; *R. S.* 52:28–34 *et seq.,* and upon its approval by Congress, Act of January 24, 1907, *c.* 394, 34 *Stat.* 858, the still pending suit was discontinued. *State of New Jersey v. State of Delaware,* 205 *U. S.* 550, 27 *S. Ct.* 793, 51 *L. Ed.* 925 (1907). The controversy over ownership of the bed of the river was not adjusted

thereby. That issue was expressly reserved. *Article* VIII; *R. S.* 52:28–42.

*Article* I provided:

"Criminal process issued under the authority of the state of New Jersey against any person accused of an offense committed * * * upon the eastern half of said Delaware river, or committed on board of any vessel being under the exclusive jurisdiction of that state, and also civil process issued under the authority of the state of New Jersey against any person domiciled in that state * * * may be served upon any portion of the Delaware river between said states from low-water mark on the New Jersey shore to low-water mark on the Delaware shore * * *."

with certain exceptions not relevant here. *N. J. S. A.* 52:28–35. A like provision relating to the westerly half of the river was made for civil and criminal process issuing out of Delaware. *Article* II; *R. S.* 52:28–36.

The effect of this language was to recognize and to establish in New Jersey substantive jurisdiction over criminal offenses committed on the easterly half of the river and to authorize the service of criminal process upon any portion thereof between low water marks of the two states. *State v. Cooper*, 93 *N. J. L.* 13 (*Sup. Ct.* 1919). In that case, Chief Justice Gummere, in disposing of the contention now being advanced, said:

"We think the first contention, that is, lack of jurisdiction, is without merit. The tidal waters of the Delaware river separate this state from the state of Delaware. By a compact entered into between these two sovereign powers, the jurisdiction of each state, both civil and criminal, extends to the middle line of the river."

However, defendant argues that a 1934 decision of the United States Supreme Court, which declared that in the area with which we are concerned presently, title to the bed of the river up to the low water mark on the New Jersey side is in Delaware, overrules the doctrine of *State v. Cooper*, *State of New Jersey v. State of Delaware*, 291 *U. S.* 361, 54 *S. Ct.* 407, 78 *L. Ed.* 847 (1934). This argument overlooks the statement in the opinion that:

"Within the twelve mile circle, the river and the subaqueous soil thereof up to low water mark on the easterly or New Jersey side will be adjudged to belong to the State of Delaware, *subject to the Compact of 1905.*" (291 *U. S.* at *page* 385, 54 *S. Ct.* at *page* 415; emphasis added.)

It ignores also the following clause in the judgment entered in the action:

"This decree is made without prejudice to the rights of either state * * * by virtue of the compact of 1905 between said states." *State of New Jersey v. State of Delaware,* 295 *U. S.* 694, 699, 55 *S. Ct.* 907, 910, 79 *L. Ed.* 1659 (1935).

Moreover, we are aware of no instance since 1935 where either state has made any effort to disavow the pact or to claim that the judgment referred to imposed a qualification upon its longevity. On the contrary, in this proceeding the brief of the State of Delaware has adopted the view of our Attorney-General with respect to its continued existence and undiminished effectiveness.

It is true, of course, that prior to 1905 New Jersey claimed the bed of the river at the location involved here to the middle of the main channel, and that the adverse ruling of the Supreme Court declared the fee thereto to be in Delaware. But ownership of subaqueous soil by one state does not stand in the way of an agreement with its neighbor on the other side for a sharing of the criminal jurisdiction over the river. *State v. Cunningham,* 102 *Miss.* 237, 59 *So.* 76 (*Sup. Ct.* 1912); *People v. Central R. Co. of New Jersey,* 42 *N. Y.* 283, 294 (*Ct. App.* 1870); *State v. Davis,* 25 *N. J. L.* 386 at *page* 388 (*Sup. Ct.* 1856). For example, the compact of 1834 between New Jersey and New York established ownership by this State of the land under the Hudson River between Manhattan Island and New Jersey to the middle of the river. *L.* 1834, *p.* 118; *N. J. S. A.* 52:28-4. By the same concord, New York was given "exclusive jurisdiction of and over all the waters of the bay of New York, and of and over all the waters of Hudson River, lying west of Manhattan Island, and to

the south of the mouth of Spuyten Duyvel Creek, and of and over the lands covered by the said waters to the low-water mark on the westerly or New Jersey side thereof." This language was held to confer on New York exclusive criminal jurisdiction over the described waters of the river to the New Jersey low water mark. *State v. Babcock*, 30 *N. J. L.* 29 (*Sup. Ct.* 1862); *People v. Central R. Co. of New Jersey, supra.* It was a grant of police power, but not a grant of sovereignty so as to interfere with the incidence of taxation arising from the ownership of the bed to the thread of the stream. *State v. Carlaftes*, 24 *N. J.* 451, 457 (1957); *Tennant v. State Board of Taxes & Assessments*, 95 *N. J. L.* 465 (*E. & A.* 1921); *Central R. Co. of New Jersey v. Jersey City*, 70 *N. J. L.* 81, 91 (*Sup. Ct.* 1903), affirmed 72 *N. J. L.* 311 (*E. & A.* 1905), affirmed 209 *U. S.* 473, 28 *S. Ct.* 592, 52 *L. Ed.* 896 (1908). Defendant's first ground for reversal is therefore without merit.

This brings us to a consideration of the contention that the County Court of Salem County had no jurisdiction because the offense was committed on the river beyond the low water mark of this State and beyond the boundaries of Salem County.

*N. J. S.* 2A:3–4 provides that the County Court "shall have cognizance of all crimes and offenses of an indictable nature which have been or shall be committed * * * in the county in and for which the court is held * * *." Thus, in the absence of some special circumstance, a crime perpetrated—whether on land or water—beyond the territorial limits of a county, could not be within the ambit of the court's authority. *State v. Davis, supra*, 25 *N. J. L.* at *page* 388.

In support of the right to prosecute in the County Court, the State relies in part upon *State v. Cooper, supra.* There, as here, the offense was committed on the New Jersey side of the Delaware River opposite Pennsgrove, in Salem County. The Supreme Court opinion indicates that the authority to entertain the indictment was sustained by reason of the 1856 act (*L.* 1856, *p.* 242; *C. S.* 5371; *N. J. S. A.*

52:28–33), which gave jurisdiction over crimes perpetrated on the easterly half of the Delaware River to the County Court "lying and being nearest to the place" of commission. But examination of the statute demonstrates beyond question that it was enacted to implement the compact of 1783 between New Jersey and Pennsylvania regarding ownership and control of the portion of the river separating them. *Rev.* 1877, *p.* 1181; *C. S.* 5368–5371; *N. J. S. A.* 52:28–23. The State of Delaware was not a party to the agreement. The segment of the river involved is between New Jersey and Delaware and not between New Jersey and Pennsylvania, and thus could not have been subject to the 1856 act. Consequently, *State v. Cooper* must be discarded as a precedent in the present issue.

Absence of such a statute to implement the 1905 New Jersey-Delaware treaty does not, of itself, signify that the County Court of Salem County is powerless to function in the matter. Defendant points to *State v. Davis, supra,* involving a criminal transgression on the Delaware River between New Jersey and Pennsylvania, which holds that the jurisdiction of the County Court is confined to the limits of the county "unless additional jurisdiction is given by the act ratifying the agreement." 25 *N. J. L.* at *page* 388. Assuming that the boundaries of Salem County within the arc of the 12-mile circle referred to end at the river (as defendant claims) notice must be taken that the pact now being enforced grants substantive police power as well as the right to serve criminal process on the river. Having in mind that the controversy between the two states existed for so many years and that it was productive of difficult and involved litigation between them, the courts ought to look at the language employed in expressing the ultimate settlement with the utmost liberality in order to give vitality and effectiveness to it. And we should accept every reasonable implication, whether stemming from the context when considered alone or in conjunction with any other cognate enactment, which tends to bring to full fruition the intention of the parties.

In this connection, authority exists in other jurisdictions (somewhat at odds with *State v. Davis, supra*) for the view that when such a compact is made, the boundaries of the counties adjoining the river will be considered as extended by implication to midchannel in order to recognize enforceable criminal jurisdiction in the courts of such counties.

In *Mahler v. Norwich & N. Y. Transportation Co.*, 35 *N. Y.* 352 (1866), the Court of Appeals had this to say on the general subject:

"We think, there is no force in the suggestion, that if the state owns to the centre of the Sound, a considerable part of our domain is not partitioned into counties and towns. Even if the statute, in declaring the bounds of the counties bordering on the Sound, had limited them, in terms, to the line of low water mark, it would indicate nothing but the mere fact that the legislature deemed their extension to the exterior water-line of the state a matter of no practical importance; but in the absence of any such limitation, we are clearly of the opinion expressed by this court on a former occasion, that the respective counties and towns, which are bounded generally on the Sound, comprehend within their limits the waters between their respective shores and the water-line of the state. This is the usual and reasonable rule in the political apportionment of territory, for the purpose of fixing the limits of civil and criminal jurisdiction."

In *State v. Kurtz*, 317 *Mo.* 380, 295 *S. W.* 747, 749 (*Sup. Ct.* 1927), it appeared that by virtue of 3 *U. S. Statutes at Large* 545 and the acceptance by Missouri and Kentucky of the boundaries there defined, Missouri had concurrent jurisdiction over the Mississippi River. The Supreme Court, in discussing the issue of jurisdiction to try criminal offenses, said:

"It follows that one transporting intoxicating liquor by boat on the Mississippi river may be prosecuted in the county, the confines of which, if extended, would comprise the waters traversed by the boat."

The Legislatures of Tennessee and Arkansas passed statutes providing that each state should have concurrent criminal jurisdiction over parts of the Mississippi River lying opposite the territory of each. In a homicide case, the Supreme

Court of Arkansas declared that "the circuit court of Crittenden County, Ark., had jurisdiction to try the defendant for an offense committed by him on the Mississippi river opposite the boundary lines of Crittenden County on said river." *Padgett v. State,* 151 *Ark.* 290, 236 *S. W.* 603, 606 (1922).

A similar view point was adopted in *State v. Cunningham, supra,* by the Mississippi Supreme Court concerning a compact between the States of Mississippi and Arkansas under which they shared concurrent jurisdiction for the full width of the river separating them. In sustaining the authority of the circuit court of Tunica County to entertain an indictment arising out of a sale of liquor on the Arkansas side of the river due west of Tunica County, the court approved the *dictum* of the Supreme Court of Iowa in *State v. Mullen,* 35 *Iowa* 199 (1872), that:

"Congress having granted to the state of Iowa jurisdiction concurrent with the state of Illinois over the Mississippi river, jurisdiction over so much of the river as lies opposite to any county on the eastern boundary of the state must attach to such county as an incident of its organization. For it is only through the medium of county organizations that this jurisdiction can be rendered availing, and it is a familiar doctrine that the grant of a right or power carries with it as an incident every thing necessary to make the power or right effective."

*See also, Brown v. State,* 109 *Ark.* 373, 159 *S. W.* 1132 (*Sup. Ct.* 1913).

But our resolution of the problem posed need not be rested upon a view that the northerly and southerly boundaries of Salem County should be considered extended by implication to midchannel. The fact is that by legislative prescription they continue that far.

Defendant quotes and relies upon the territorial limits of Salem County established January 21, 1710 (*R. S.* 161) as they appear on page 178 of *Nixon's Digest* (*4th ed.* 1868):

"25. *Sec.* 8. Salem county begins at the mouth of a creek on the west side of Stipson's island, commonly called Jecak's creek; thence up the same as high as the tide floweth; thence upon a

direct line to the mouth of a small creek at Tuckahoe, where it comes into the southernmost main branch of the fork of Great Eggharbor river; thence up the said branch to the head thereof; thence along the bounds of Gloucester county to Delaware river; thence down Delaware river and bay to the place of beginning."

Manifestly, this description does not run to the middle of the river. But we have difficulty in understanding how paragraph 30 on the very same page of the *Digest* could have escaped attention. Found there is a supplementary act adopted in 1822 (*R. S.* 164) as follows:

"30. *Sec. 4.* The northern bounds of the county of Salem, shall be taken and deemed to be as follows: to extend from the middle of the channel at the mouth of Oldman's creek, *to the main ship channel of the river Delaware,* striking the same at a right angle, and the *southern bounds extending from said ship channel along the Cumberland* line, to the middle of the channel at the mouth of Stow creek." (Emphasis added.)

And this same description is set forth in the *Revision of 1877, p.* 199. Again, on *page* 203 of the same *Revision,* as well as in the *Compiled Statutes* at *page* 1690, the ship channel boundary is repeated in this wise:

"[That] the boundary lines of the counties of Salem, Cumberland and Cape May, are hereby declared to be the main ship channel in the river and bay of Delaware adjoining said counties respectively." (*L.* 1846; *R. S.* 171.)

The particularly significant circumstance of this delineation is that it encompasses the riverfront of Salem, Cumberland and Cape May Counties, that is, almost the entire waterfront from the Delaware-Pennsylvania line on the westerly side of the river to the southern tip of Cape May County at the bottom of our State. In this connection, it must be kept in mind that only a portion of the riverfront line of Salem County is within the arc of the 12-mile circle.

Undoubtedly, originally the line was fixed at the thread of the river as an assertion of ownership and sovereignty up to that point. Such was the nature of the claim when the 1905 pact was consummated and undisputed criminal

jurisdiction on the easterly half of the river yielded to New Jersey. Although, as has been indicated, the title assertion to the bed within the 12-mile circle of New Castle, Delaware, was dissipated by the 1934 United States Supreme Court decision, the adverse judgment thereon was made expressly subject to that agreement and so left unaffected the geographical limits of *authority* of the two states to deal with crime. Thus, despite the loss of sovereignty beyond the low water mark in this limited area, police power over the contiguous half of the stream was retained.

When the statutes were revised in 1937 (*L.* 1937, *c.* 188) the laws referred to above establishing the boundary line of Salem County at the main ship channel were saved from repeal. *R. S.* 40:18–4. (No necessity exists in this case to consider whether "main ship channel" and the "eastern half" of the river are indicative of the same line.) Obviously, the Legislature was aware of the 1905 pact and the Federal Supreme Court judgment as to Delaware ownership to the New Jersey low water mark, which judgment was entered while the work of the Revision Commission was in progress. The act of 1822 and the pertinent portion of that of 1846 served no purpose at all except to define the riverside boundaries of Salem County. Preservation of the portion thereof within the 12-mile circle by the *Revised Statutes* could not have been adopted with any claim of title in mind. New Jersey had been enjoined from disputing the sovereignty of Delaware over that territory by the 1935 judgment of the United States Supreme Court. *State of New Jersey v. State of Delaware, supra,* 295 *U. S.* at *page* 699, 55 *S. Ct.* at *page* 910. The Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose. *Appeal of New York State Realty & Terminal Co.,* 21 *N. J.* 90 (1956); *Barringer v. Miele,* 6 *N. J.* 139, 144 (1951); *Eckert v. New Jersey State Highway Department,* 1 *N. J.* 474 (1949); *Greene v. Hudson County Board of Health,*

19 *N. J. Super.* 453 (*Law Div.* 1952). And the courts have the duty of reconciling them so as to give effect to both expressions of the lawmakers' will. *Scancarella v. Department of Civil Service,* 24 *N. J. Super.* 65 (*App. Div.* 1952). So a reasonable conclusion in the present instance is that the design was to safeguard the jurisdiction of the County Court and to give efficacy to its hand in administering the criminal law on the easterly half of the river for the full frontage of Salem County as our State had solemnly agreed with Delaware to do.

The history of legislative action in comparable situations reveals an awareness of the problem of criminal law enforcement on our inland and coastal waterways. For many years authority to deal with offenses committed on rivers marking the boundary lines of counties has been exercised concurrently by the County Courts of both counties, *N. J. S.* 2*A*:11–5, and crimes perpetrated on the Atlantic Ocean within the three-mile limit have been prosecuted in the County Court, *R. S.* 40:18–5. Accordingly, we hold the view that the Legislature was fully cognizant of the need for and the effect on the jurisdiction of the County Court of establishing and continuing the boundary lines of Salem County to midchannel.

The judgment of conviction is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.