**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2868-19

IN THE MATTER OF NEW
JERSEY SPORTS AND
EXPOSITION AUTHORITY
RESOLUTION 2020-07,
ADOPTING THE HACKENSACK
MEADOWLANDS DISTRICT
MASTER PLAN UPDATE 2020.

_____

Argued October 18, 2021 – Decided January 27, 2022

Before Judges Rothstadt, Mayer, and Natali.

On appeal from the New Jersey Sports and Exposition Authority.

David W. Phillips argued the cause for appellant Towers Associates, Ltd. (Sills Cummis & Gross, PC, attorneys; Joseph B. Fiorenzo, of counsel and on the briefs; David W. Phillips and Marshall O. Dworkin, on the briefs).

Frederick W. Alworth argued the cause for respondent New Jersey Sports and Exposition Authority (Gibbons, PC, attorneys; Frederick W. Alworth, Kevin W. Weber, and Jacob J. Franchino, on the brief).

PER CURIAM

Towers Associates, Ltd. (Towers) appeals from the New Jersey Sports and Exposition Authority's (NJSEA) February 6, 2020 final agency decision adopting the Hackensack Meadowlands District Master Plan Update 2020 (Master Plan Update). On appeal, Towers argues the NJSEA should not have adopted the Master Plan Update because it was inadequate in significant aspects as it "is not a comprehensive plan," because it was adopted prior to adopting a new District Transportation Plan; it was overly broad in its "employment center planning area classification"; contrary to "good planning practices"; and otherwise arbitrary and capricious, which resulted in the "undermin[ing]" of "Towers'[s] due process rights."[1] For the reasons stated in this opinion, we disagree with Towers's contentions and affirm the NJSEA's challenged action.

---

[1] Towers also filed a motion on June 8, 2020, with our court to supplement the record to include information related to its Open Public Records Act, N.J.S.A. 47:1A-1 to -12, requests it made to the NJSEA concerning reclassification of a neighboring property, and with documents from a related matter, In re Use Variance Application File No. 17-239, No. A-1391-18 (App. Div. Aug. 4, 2020) (slip op. at 2-13), certif. denied, 244 N.J. 459 (2020), among others. On July 31, 2020, we denied the motion "without prejudice to [Towers] arguing to the merits panel that judicial notice should be taken of specifically identified documents." On September 30, 2020, Towers filed a two-volume supplemental appendix containing documents that it contends should be judicially noticed by the panel. We address this application infra Part V.

I.

To place the parties' dispute in proper context, we provide a detailed discussion of the facts, identifying the parties, the properties involved, and the development of the Master Plan Update that sits at the center of this controversy.

The District

The Hackensack Meadowlands District (District) was created by the New Jersey Legislature in 1968 with the enactment of the Hackensack Meadowlands Reclamation and Development Act, (HMRDA), N.J.S.A. 13:17-1 to -86.[2] It is comprised of a 30.4 square-mile area covering parts of fourteen municipalities[3] in Bergen and Hudson Counties.

---

[2] The HMRDA "represents a legislative plan for the reclamation and development of the Hackensack Meadowlands on a regional basis by a Commission constituting a political subdivision of the State, with intermunicipal sharing of the respective tax benefits and tax burdens resulting from the planned development." Meadowlands Reg'l Redevelopment Agency v. State, 63 N.J. 35, 39 (1973).

[3] The municipalities are "Carlstadt, East Rutherford, Little Ferry, Lyndhurst, Moonachie, North Arlington, Ridgefield, Rutherford, South Hackensack[,] and Teterboro all in Bergen [C]ounty; and Jersey City, Kearny, North Bergen[,] and Secaucus, all in Hudson [C]ounty." N.J.S.A. 13:17-3(j).

A-2868-19

The Hackensack Meadowlands Agency Consolidation Act (HMACA), N.J.S.A. 5:10A-1 to -68, merged the former New Jersey Meadowlands Commission (NJMC) and its varied and vast responsibilities[4] into the NJSEA. N.J.S.A. 5:10A-6 to -7.

Pertinent to this appeal are the NJSEA's obligations under HMACA subsection (b),

> [t]o prepare, adopt, and implement a master plan for the physical development of all lands, or a portion thereof, lying within the district, and to adopt and enforce regulations, codes, and standards for the effectuation of such plan;

---

[4] As we explained in 1972:

> [t]he [NJMC] was created by the New Jersey Legislature in 1968 for the purpose of overseeing the orderly development of the Meadowlands (N.J.S.A. 13:17-1 [to -86]). The Commission was empowered to prepare and adopt "a master plan or portion thereof for the physical development of all lands lying within the district, which plan may include proposals for various stages in the future development of the district."
>
> [Meadowland Reg'l Dev. Agency v. Hackensack Meadowlands Dev. Comm'n., 119 N.J. Super. 572, 573 (App. Div. 1972) (quoting N.J.S.A. 13:17-9).]

and under subsection (p), "[t]o create a transportation planning district and develop strategies to improve regional comprehensive planning." N.J.S.A. 5:10A-7(b), (p). A "master plan" is defined by the HMACA as the "comprehensive plan for the district prepared and adopted by the commission." N.J.S.A. 5:10A-3. According to the NJSEA, the master plan "serves as [its] primary policy and planning document" for the District and "guides future decision-making; serves as the basis for the implementation of policies, including future amendments to the NJSEA's regulations codified at N.J.A.C. 19:3-1.1[ to -1.5]; and promotes the creation of additional studies and plans with a more refined focus." The HMACA also specifically provides direction for the master plan's creation and implementation, including a description of its contents and a timetable for when the NJSEA is obligated to complete the process. N.J.S.A. 5:10A-10. Under the HMACA, the NJSEA was obligated to complete a new master plan by February 15, 2020. N.J.S.A. 5:10A-10(d).

<u>The Towers and MEPT Properties</u>

Towers owns eleven acres of property in the District designated on the tax maps of the Town of Secaucus as adjacent Lots 1.02 and Lot 7 in Block 155. A Home Depot store is located on part of the property, and Towers anticipates building a hotel on another part.

Towers's primary objection to the Master Plan Update centers around the NJSEA's reclassification of part of another property in the District located behind Towers's property, formerly owned by MEPT Lincoln Crossing, LLC (MEPT), and designated on the tax map of Secaucus as Lots 1.03, 1.04 and 6 in Block 155 and on the tax map of North Bergen as Lot 14.011 in Block 451.05 (MEPT property).[5]

The MEPT property is comprised of 19.9 acres and has a 236,207-square-foot vacant building most recently used by the now-defunct clothing retailer Daffy's as a warehouse/distribution facility, corporate headquarters, and accessory retail outlet, which MEPT proposed to replace. The building situated on the MEPT property has been vacant since 2012.

Towers's and MEPT's properties are located south of Paterson Plank Road, west of Route 3, north of Route 495, and east of the New Jersey Turnpike off-ramp for Exit 16E. A private roadway named Daffy's Way, "governed by a reciprocal easement agreement (REA) executed in 1992 by Towers and MEPT's predecessor in title," provides an additional ingress and egress to the parcel from Paterson Plank Road. In re Use Variance Application, slip op. at 3. Leonard

---

[5] MEPT sold the MEPT property to another entity after Towers filed the instant appeal.

A-2868-19

Gero, a principal of Towers, described the area in which the properties are located as a "40-acre island which sits at the first intersection of all the major roads in New Jersey."

In 2018, the NJSEA granted MEPT a use variance to construct a new warehouse and distribution facility on the MEPT property, which, until the Master Plan Update, was in the District's Commercial Corridor Planning Area that did not permit warehouses. Id. at 2. Towers appealed the decision to grant the use variance. We affirmed in an unpublished opinion. See id. at 2-3. The Supreme Court denied certification. In re Use Variance Application, 244 N.J. at 459. In the 2020 Master Plan Update, the NJSEA removed the MEPT property from the Commercial Corridor Planning Area and added it to the District's Employment Center Planning Area, within which development of warehouse and distribution facilities is contemplated.

The Master Plan Update Process

Under the HMACA, the master plan update had to be prepared by the NJSEA following public hearings, and meetings with the constituent municipalities and affected counties, and "be a composite of the one or more written proposals recommending the physical development of the lands within the district, in its entirety or a portion thereof." N.J.S.A. 5:10A-10(a). As also

7

required by the HMACA, it was to "include a report presenting the objectives, assumptions, standards, and principles, as set forth in the master plan," and "provisions or criteria for the location and use of buildings, structures, facilities, and land for solid waste disposal and recycling." N.J.S.A. 5:10A-10(e). The HMACA did not require, but provided the master plan update "may include provisions for" elements, such as "the use of land and buildings, residential, commercial, industrial, park, and other like purposes," as well as "transportation[ and] streets." N.J.S.A. 5:10A-10(e)(1), (3). It could also include "proposals for various stages for the future development of the district." N.J.S.A. 5:10A-10(a).

Finally, "prior to [taking] final action thereon," the NJSEA had to submit its master plan update to the Hackensack Meadowlands Municipal Committee (the Committee) for review.[6] N.J.S.A. 5:10A-9. The Committee had "120 days after receipt of a major revision of the master plan to convey its position, in writing" to the NJSEA. N.J.S.A. 5:10A-9. If the Committee rejected the master plan update, the NJSEA could "not take action on any matter required to be

---

[6] As explained by the NJSEA, "[i]n recognition of the need to maintain public input and interaction with local governments," related legislation, the HMRDA, N.J.S.A. 13:17-1 to -86, established the Committee which consists of "the mayor or elected chief executive, or his designated alternate, of each constituent municipality." N.J.S.A. 13:17-3(w), -7(a).

submitted to the committee, . . . except by an affirmative vote of the majority of [the NJSEA's] members."  N.J.S.A. 5:10A-9(c).

The Draft Master Plan Update

In accordance with its legislative mandate to revise the existing master plan and adopt an updated plan by February 15, 2020, the NJSEA's Land Use management staff collaborated with other NJSEA divisions (including Executive, Natural Resources, Solid Waste, and Finance), as well as the Rutgers Meadowlands Environmental Research Institute, the Meadowlands Conservation Trust, and 4Ward Planning, which is the NJSEA's demographics consultant.  They met with representatives from the District's constituent municipalities, obtained their input, and solicited feedback from other stakeholders, including the Meadowlands Regional Chamber of Commerce.

Thereafter, on August 5, 2019, the NJSEA issued a draft of the Master Plan Update for public comment.  According to the draft, it "was developed to achieve the following goals and objectives" for the District and "buil[t] upon those established in 2004":[7]

---

[7]  The District's first master plan was adopted in 1972.  In 2004, the NJMC adopted a new master plan, and, later, it adopted new zoning and land use regulations for the District.

9

1. To safeguard and restore the Hackensack Meadowlands'[s] irreplaceable heritage of natural and historic resources.

2. To promote a suitable array of land uses that encourages economic vitality with job creation and supports the public health, safety, and general welfare.

3. To foster the Meadowlands economy in a manner that stimulates job growth and prosperity.

4. To create a sense of place that captures the character and identity of the Meadowlands.

5. To facilitate the creation of housing opportunities in suitable locations to accommodate the needs of the region's population.

6. To promote a regional transportation network that improves the mobility of people and freight, fuels economic development, and minimizes negative impacts upon the environment.

7. To increase the security and resiliency of the District and its neighboring areas by mitigating hazards and risks.

8. To encourage the development and use of reliable, responsible, low-carbon and alternative energy sources while reducing energy consumption.

9. To direct the NJSEA's policies and practices toward a sustainable Meadowlands.

10. To provide excellence in public service.

11. To deliver the vision of this Master Plan in solidarity with other District stakeholders.

The draft's first six chapters, entitled Introduction, Population and Economy, Land Use, Housing, Environment, and Circulation, "contain[ed] the research and evaluation that went into the 2004 [NJMC] Master Plan" and described "current conditions in the district."  The remaining three chapters, entitled System Plan, Area Plans, and Sustainable Meadowlands:  A Guide to Resiliency, presented the substance of the Master Plan Update, "which provides a policy perspective for the district for the next ten years, building on the 2004 plan."

Of relevance to this appeal were the chapters pertaining to Land Use, Circulation, System Plan, and Area Plans.

## Land Use

In the Land Use chapter, the NJSEA reviewed "the existing land usage in the District in order to evaluate significant changes in land use patterns since 2004" and to "identify[] matters that require the formulation of new policies to respond to current and anticipated future conditions."  Per the NJSEA, "[t]his analysis lays the groundwork for the formulation of an updated Land Use Plan and, ultimately, amended District Zoning Regulations."

Toward that end, the NJSEA reviewed the sixteen existing land uses within the District.  The NJSEA determined "[i]ndustrial uses comprise the

11

largest active land use category, covering 3,151 acres, or 16.2[%], of the District's land area" and deemed the District "a mecca for the Industrial sector, particularly for warehouse and distribution facilities" given the District's population density, major transportation routes, proximity to New York City, ports and airports, and freight rail facilities. It recognized "a 12.8% increase in land area dedicated to industrial uses in the District since 2004" and noted "warehouse and distribution uses comprise the majority of land use applications" in the District. It concluded "the share of District land area occupied by industrial uses is anticipated to increase in the coming years."

With respect to Commercial Retail and Hotels and Motels, the NJSEA found "[r]etail, restaurants, and similar commercial/service uses have expanded their presence within the District and currently occupy approximately 287 acres within the District, 1.5[%] of the District's total land area." It cited "a 24[%] increase in the land area of the District dedicated to retail" between 2004 and 2018. Hotels and motels comprise only 0.4% of the District's land area, although "[h]eightened interest in hotel development . . . has been evident in the past few

years, presumably in anticipation of the opening of American Dream Meadowlands."[8]

Circulation

In chapter six, the NJSEA explained that "[a]n efficient, multi-modal transportation network is a vital component of the overall vision" for the District and reviewed "transportation planning efforts and achievements since 2004," focusing on mobility and safety. Regarding mobility, the NJSEA analyzed the District's roadways, which "are among the most heavily traveled in the nation," and found "[t]he District serves as a gateway to New York City through a variety of major roadways, including the New Jersey Turnpike and Route 3." It further found since 2000, "[t]he principal mode of transportation in the region is the automobile, account for nearly 67[%] of all trips, a slight decrease from 68[%] in 2000." Walking or biking "rose to 18[%] from 16[%]" in 2000.

As part of its mobility analysis, the NJSEA did not perform its own comprehensive traffic study of the District's current traffic conditions. Instead, it reviewed traffic studies prepared by public and private transportation planning

---

[8] The American Dream Meadowlands mall, located at the Meadowlands Sports Complex site, is, according to the NJSEA, "one of the largest and most unique shopping, entertainment, and tourism centers in the world. The three[-]million-square-foot facility will include a mix of entertainment and retail experiences, including amusement and water parks, shops, a movie theater, and dining."

organizations, including traffic volume data collected in 2013 by the New Jersey Department of Transportation (DOT) for the District's most heavily-traveled major roadways. Notably, "[t]he heaviest-traveled routes within the District are Route 3 and Route 495," which surround the Towers and MEPT properties. Secaucus and North Bergen have the third and fourth-highest annual average daily traffic in the District.

Based on its review of traffic studies, the NJSEA determined "the weekday morning peak traffic period in the District" is from 6:00 a.m. to 9:00 a.m., with the heaviest volume between 8:00 a.m. and 9:00 a.m. The afternoon peak traffic period is from 3:30 p.m. to 7:00 p.m., with the heaviest volume between 5:00 p.m. and 6:00 p.m. On Saturdays, peak traffic occurs between 11:00 a.m. and 1:30 p.m.

The NJSEA acknowledged "[t]ravel demands in the District continue to increase" and that mobility "remains one of the region's biggest challenges" due to "the inadequate capacity of major roadways, particularly Routes 3, 17, 46, 120, and the New Jersey Turnpike; limited roadway crossings over the Hackensack River; and insufficient interstate highway access." However, it credited its implementation of the Meadowlands Adaptive Signal System for Traffic Reduction (MASSTR), "an intelligent transportation system (ITS)" that

14

"incorporates all of the Meadowlands region's traffic signals into a network of self-adaptive traffic signals," for "decreas[ing] delays and travel time in surrounding transportation corridors and alleviat[ing] congestion in the area."

As for safety, the NJSEA expressed its goal "to improve overall system safety and reduce serious injuries and fatalities for all travelers on all modes." It evaluated roadway and transit crash data collected between 2004 and 2019 by the DOT. While roadway crashes in the District declined between 2004 and 2013, they began to rise in 2014 "likely fueled by the improving economy." However, fatality-related roadway crashes declined by 25% between 2004 and 2017. Between 2010 and 2017, roadway crashes in Secaucus accounted for 7% of all crashes in the District, while roadway crashes in North Bergen accounted for 14% of all crashes in the District.

The NJSEA concluded "[t]he District's transportation network requires greater interconnectivity and capacity to meet current and future demands" as it is "expected to face the continuing challenge of severe road congestion and unreliable travel times in many locations." It also concluded that "[m]ore emphasis on 'Complete Streets,'[9] . . . is needed in the future to add more

_____

[9] Complete Streets is a United States Department of Transportation (USDOT) initiative. According to the USDOT, "Complete Streets are streets designed and

facilities for safe walking and biking," and that "truck access needs to be improved" to meet "the already high demand for freight movement."

<u>System Plans</u>

The System Plan addressed the following broad categories affecting the District:   (1) Natural Environment; (2) Economic Development; (3) Transportation; (4) Housing; (5) Community Facilities; and (6) Historic Resources.  The overall vision of the System Plan "is to preserve the natural resources of the Meadowlands while promoting economic prosperity." Although the NJSEA concluded most of the strategies of the 2004 NJMC Master Plan have been effective, as implementation of the plan has progressed, it sought to update and expand the objectives "to reflect current and anticipated conditions" and to recommend "additional studies to be completed to ensure that these objectives remain relevant."

---

operated to enable safe use and support mobility for all users," including "people of all ages and abilities, regardless of whether they are travelling as drivers, pedestrians, bicyclists, or public transportation riders"; and "Complete Street policies are set at the state, regional, and local levels and are frequently supported by roadway design guidelines."  U.S. Dep't Transportation, <u>Complete Streets</u>  https://www.transportation.gov/mission/health/complete-streets  (last updated Aug. 24, 2015).

A-2868-19

The NJSEA explained its eight objectives with respect to improving the District's transportation network and the ability to meet future demand as follows:

> 1.  Enhance coordination and cooperation among local and regional transportation agencies.
>
> 2.  Improve the inter-relationship between land use and the transportation system through the NJSEA's policies and regulations.
>
> 3.  Promote efficient and livable communities within the District.
>
> 4.  Encourage the use of public transit within a cohesive and integrated multi-modal transportation system.
>
> 5.  Promote safe and efficient pedestrian and bicycle circulation.
>
> 6.  Foster the development of an integrated intermodal freight system.
>
> 7.  Increase safety for motorized and non-motorized users of the transportation system.
>
> 8.  Foster evolving transportation technologies.

To achieve those objectives, the NJSEA confirmed it would, in relevant part: update the District Transportation Plan;[10] "[g]enerate and maintain data

---

[10]  The NJSEA is also responsible for promulgating a transportation plan for the District. In 2005, the Legislature enacted the Hackensack Meadowlands

A-2868-19

for use in transportation and traffic studies, land use, and transportation modeling/simulation"; adopt uniform criteria pertaining to "[i]dentification of land use impacts upon the current capacity of the transportation network"; prepare traffic impact studies "in connection with proposed development projects"; "[p]romote implementation of 'Complete Street[s]' initiatives to enhance public safety and improve connectivity of the District's pedestrian and bicycle network"; and "[p]romote safe and efficient on-site circulation through

Transportation Planning Act, N.J.S.A. 13:17-95 to -106. Under that Act, the NJMC adopted the 2007 Meadowlands District Transportation Plan which "identif[ied] transportation needs, recommend[ed] specific improvements, and estimate[ed] costs of improvements over a time frame that reaches to the year 2030." Under more recent legislation, the Hackensack Meadowlands Transportation Planning District Act of 2015 (HMTPDA), N.J.S.A. 5:10A-69 to -81, the NJSEA was made responsible for the development of future District transportation plans. N.J.S.A. 5:10A-70 to -73. The HMTPDA, enacted the same day as the HMACA, directs the NJSEA and the "Meadowlands Transportation Planning Board" to "oversee the development of a district-wide transportation plan through a consultative process which relies upon the participation of public and private sector interests." N.J.S.A. 5:10A-70(d).

"The district transportation plan [must] establish goals, policies, needs, and improvement priorities for all modes of transportation, including walking and bicycling, within the district for the ensuing [twenty] years following the effective date of" the HMTPDA. N.J.S.A. 5:10A-73(a). Additionally, the plan "[must] be consistent with the master plan" adopted by NJSEA pursuant to the HMACA and "[must] be based on a reasonable assessment of likely future growth reflected in that master plan." Ibid. (emphasis added). NJSEA may adopt the transportation plan by resolution "as recommended by the board or with modifications." N.J.S.A. 5:10A-73(f).

18

the separation of truck and passenger vehicles, with provisions for dedicated safe routes within vehicular use areas for pedestrians and cyclists."

Area Plans

The NJSEA explained that "[t]he Area Plans constitute the Land Use Plan" for the District which "present strategies for each of the Planning Areas" and that "[f]uture development . . . is expected to proceed in accordance with the Area Plans."  It clarified that "[p]lanning areas do not constitute zoning districts; rather, the descriptions of the Planning Areas provide the basis for the development of an updated zone plan and regulations.  The zone plan and regulations will be the mechanism by which the policies of the Master Plan are implemented and enforced."  (Emphasis added).

The Draft Master Plan Update proposed twelve planning areas, two of which were the Commercial Center and the Employment Center.  While the Commercial Center Planning Area constituted just 2% of the District, the Employment Center Planning Area was the second largest, constituting 16.7% of the District.

The Commercial Center Planning Area includes most of Towers's property and other commercial properties in Secaucus with "frontage along Paterson Plank Road."  "Planning considerations for the Commercial Center

Planning Area include the provision of a diverse mix of commercial uses within these areas, careful consideration of circulation impacts, including a safe pedestrian environment, and the provision of adequate parking."

As for the MEPT property, which under the Master Plan Update would be removed from the Commercial Center Planning Area in favor of the Employment Center Planning Area, the NJSEA noted in relevant part:

> Some properties in this area, which had been within the Commercial Corridor designation in 2004, are reclassified to other planning areas in this Master Plan due to visibility, access, and/or circulation constraints that affect the feasibility of accommodating commercial uses on these properties, and to encourage a mix of uses within the area with varying peak hours of travel in an effort to minimize new traffic impacts.

Regarding the Employment Center Planning Area specifically, the NJSEA determined that "[t]he Area Plan calls for centers with a concentration of industrial and warehouse distribution businesses, business and professional services, and the continuation of office development." The Employment Center Planning Area "contains the workplaces for a relatively large number of the District's employment population" and "may include a mix of land uses such as office, warehouse and distribution facilities, and light industrial facilities."

Planning considerations for the Employment Center Planning Area "include maintaining a high level of transit services available to these areas, and

20

providing for limited complementary commercial uses to support the needs of the workforce within this area." The NJSEA noted that "[e]mployment centers have been adept at adapting to current market conditions" and that some properties within the Employment Center Planning Area "have also been deemed suitable to accommodate housing development in an effort to promote affordability for residents and workers in the region."[11]

Towers's Initial Written Comments

On July 11, 2019, the NJSEA issued a public notice requesting comments on the Draft Master Plan Update, advising that the public comment period would commence on August 5, 2019, end on September 16, 2019, and that two public hearings would be held on September 10, 2019, at 10:00 a.m. and 6:00 p.m. It further advised "[u]pon consideration of the comments, the NJSEA staff will prepare a final Master Plan for approval by the NJSEA Board of Commissioners" no later than February 5, 2020.

---

[11] The Employment Center Planning Area encompasses certain properties in North Bergen and Secaucus, including the MEPT property, "in the vicinity of, but without direct access to, Paterson Plank Road." NJSEA established the boundary line between the Commercial Center Planning Area (where the Home Depot is located) and the Employment Center Planning Area behind it consistent with the municipal boundary line between Secaucus and North Bergen.

A-2868-19

On September 10, 2019, Towers submitted written comments objecting to the Draft Master Plan Update, along with the following exhibits: (1) an analysis of the Draft Master Plan Update by Steve Lydon, Professional Planner, of Burgis Associates, Inc. (the Planning Report); (2) a September 4, 2019, traffic analysis by Bowman Consulting Group (the Traffic Report); and (3) correspondence dated August 30, 2019, and September 6, 2019, pertaining to Towers's Open Public Records Act (OPRA) request to the NJSEA.[12]  Towers's objections centered around the potential increased traffic that development of a distribution facility on the MEPT property would bring to the area and its potential negative impact on the Home Depot, Towers's planned hotel, the local economy, the environment, and the safety of area retail customers and residents.

<u>Towers's Planning Report</u>

The Planning Report analyzed the Draft Master Plan Update as it pertained to the "Study Area" in which the Towers and MEPT properties were to be

_____

[12] Towers supports its challenge to the adoption of the Master Plan Update with an argument based upon what it perceives as its unsuccessful OPRA request to the NJSEA for documents concerning the reclassification of the MEPT property. We conclude that argument is without sufficient merit to warrant a discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). Suffice it to say, in this case, the fact that Towers's OPRA request may not have yielded responsive documents, does not lend support to the conclusion advanced by Towers on appeal that adoption of the Master Plan Update was arbitrary, capricious, or unreasonable, given the substantial record.

located. It examined "current land uses, existing conditions[,] and prior master plan recommendations to determine if recommendations offered for the Study Area in the Draft Master Plan are consistent with [its] goals and objectives" as well as whether "such recommendations are supportive of the public interest and further the general welfare of the Meadowlands District and the greater region." The report concluded the MEPT property should be classified as a Commercial Center instead, consistent with its original classification in the 2004 District Master Plan. Generally, it opined that the reclassification would detract from the character and development potential of the Study Area, and that it failed to advance various transportation and economic goals expressed in the Draft Master Plan.

In particular, the Planning Report opined the Employment Center classification is: (1) non-traditional, too general, permits too many inconsistent land uses ranging from industrial to residential, and brings in disruptive truck traffic; (2) contrary to mobility and Smart Growth[13] planning principles in that it thwarts the free-flow of traffic, and creates new truck traffic that will add congestion and hinder Towers's future development of a hotel; (3) contrary to

---

[13] The purpose of planning with Smart Growth principles "is to consume less land, deplete fewer natural resources, and use the State's infrastructure more efficiently." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 243 (2015).

encouragement of economic vitality and job creation because retail stores create more jobs than warehouse space; and (4) illogical as applied to Towers's property as it splits Towers's vacant lot into part Commercial Center and part Employment Center.

The report explained "retail use generates limited amounts of new traffic," which is preferable in the Study Area because it "has some of the most congested roadways in the nation." The report added "[w]hen retail uses congregate as they do in shopping centers, and offer a wide mix of uses, one vehicle trip can have multiple trip ends," which "promotes trip efficiency, reduces vehicle miles traveled, reduces automobile generated pollution loads and reduces uses of carbon energy sources."

However, "[d]evelopment of a fulfillment center within the Study Area," as permitted under the Employment Center Planning Area classification, "would be generating new traffic to an already congested area" and "negatively impact levels of service of nearby intersections." It would create safety concerns because passenger cars would be forced to compete with large trucks, resulting in more accidents, and negatively impact air quality. The report concluded "[d]eveloping a fulfillment center in the Study Area is contrary to and

A-2868-19

defeats . . . [the goal of] developing an integrated intermodal freight strategy" since freight rail lines are absent from the Study Area.

## Towers's Traffic Report

Towers's Traffic Report focused on "the transportation aspects of changing the land use designation [of the MEPT property] from Commercial Corridor to Employment Center."  It concluded the reclassification is "inconsistent and incompatible from a transportation perspective with the adjacent [commercial] uses" and does not support the Draft Master Plan Update's goals to:  (1) "promote a regional transportation network that improves the mobility of people and freight, fuels economic development, and minimizes negative impacts upon the environment"; and (2) "increase the security and resiliency of the District and its neighboring areas by mitigating hazards and risks."  It explained the project would bring in new truck traffic; "increase traffic hazards," "negatively impact air quality, noise," and "the general flow of traffic" by "mixing disparate traffic streams in an already congested roadway network"; and "have a disproportionate impact on traffic operations" on Paterson Plank Road and Route 3, "one of the most heavily traveled roads in the region and in the nation."

A-2868-19

The Traffic Report also concluded "[t]he development proposal . . . does not promote safe and efficient on-site circulation, not only within the project but along Daffy's Way" because the road "is currently the sole access for the Home Depot and this will be used as a primary route for truck traffic to enter and exit the proposed parcels." Additionally, it concluded "the access and circulation system for the subject lot would need to be segregated from the adjacent commercial uses as the character of traffic would not be compatible with the adjacent uses, particularly given the high truck traffic." Moreover, the proposed fulfillment center within the Employment Center Planning Area does not promote "'Complete Streets' principles" in that it lacks "dedicated pedestrian areas and safe pedestrian linkages among various uses." Instead, the project will be "surrounded by parking areas, loading facilities and trailer storage spaces," and the "sidewalk along the curb line of Daffy's Way plac[es] pedestrian[s] directly against the truck traffic and other traffic traveling to and from the proposed fulfillment center."

Public Hearings

On September 10, 2019, the NJSEA held two public hearings, one in the morning and one in the evening.[14] The NJSEA's engineers and planners offered

---

[14] No relevant public comments were offered during the evening hearing.

A-2868-19

introductory remarks during which they summarized the Master Plan Update. During their comments, they explained although the 2004 NJMC Master Plan established a twenty-five to thirty-year-vision and was "for the most part, still valid," the HMACA timetable for its revision prompted the NJSEA to update it. They acknowledged "more in-depth studies of certain sectors," including transportation, "are required that, for timing resource reasons, are not included in this draft." They stated that they were in the process of updating the 2007 District Transportation Plan, and that it would "identify and address current transportation network challenges, as well as future opportunities and improvements."

During the public comment portion of the morning hearing, four people spoke on behalf of Towers: (1) David Phillips, an attorney for Towers; (2) Brennan (3) Lydon; and (4) Gero. Other commenters included Gary Jeffas, the Town Administrator of Secaucus, and Jim Kirkos, the President and CEO of Meadowlands Regional Chamber of Commerce. Consistent with the written comments previously submitted, the hearing comments centered around the potential increased traffic that development of a distribution facility on the MEPT property would bring to the area, and the traffic's potential negative impact on the Home Depot, its retail customers, and residents of Secaucus.

A-2868-19

On September 16, 2019, Towers submitted additional written comments and objections and enclosed a report from Brennan, in which he concluded that the reclassification of the MEPT property "does not seem to be a logical change" and instead "seemed to be a means of supporting a new industrial use for the currently abandoned [MEPT] site" motivated by the NJSEA's approval of the use variance. Brennan opined the reclassification, "which permits industrial uses, has no place in a commercial center as it shares no synergies or vehicle trips with the surrounding uses." He explained "[t]his is especially problematic" because of the shared access "along Daffy's Way with an existing commercial use (Home Depot)." He highlighted the incompatible nature of the increased truck traffic in an area with retail commercial establishments, which will result in congestion and "forced interaction of different vehicle types."

As did the other experts for Towers, Brennan also opined that the reclassification "do[es] not further or support a number of the objectives of the Draft Master Plan," including "the encouragement of complete streets, public transportation, bicycling, etc." Additionally, he opined the reclassification lacked "quantified support" in the form of "comprehensive data." In particular, he cited the lack of a "holistic study of the regional transportation system," or

reference to "freely available probe vehicle data" in the Draft Master Plan Update.

The NJSEA's Response to Public Comments

On September 25, 2019, the NJSEA's Master Plan Staff issued a memorandum entitled "Public Hearing Summary & Response to Comments." Part of the memorandum provided a detailed response to the comments and reports submitted by Towers.

After "carefully evaluat[ing]" the documentation Towers submitted and considering "many factors," including "the characteristics of the [MEPT] property, development patterns of the area, and the land use classification in the 2004 [NJMC] Master Plan," the NJSEA determined that "no revisions are proposed to the Draft [Master] Plan [Update] as a result of [Towers's] comments" and "that the land use plan designation of the properties in the vicinity of Paterson Plank Road, including the MEPT site, will remain as proposed in the Draft [Master] Plan [Update]."

By way of background, the memorandum explained the NJSEA Land Use Management staff who were involved with preparation of the Draft Master Plan Update also prepared the land use portion of the 2004 NJMC Master Plan and "a use variance recommendation report regarding the development of a new

29

warehouse to replace the former Daffy's warehouse on the MEPT property." As for the Commercial Corridor Planning Area classification applied to the Study Area in 2004, the memorandum explained the staff utilized said classification

> in recognition of the commercial development that had occurred along the Paterson Plank Road corridor since the adoption of the 1970 Comprehensive Land Use Plan (including big box retail development such as Home Depot and Best Buy, and retail development that was considered accessory to existing warehouse properties in this area, such as Ethan Allen Furniture and Daffy's), as well as the area's location along major state highways, including Route 3, Route 495, and the New Jersey Turnpike. At the time that the 2004 [NJMC] Master Plan was being prepared, there was no specific intent to increase retail development in the area, as Towers asserts, but merely to classify the land based on the character of the predominant land uses in the vicinity.

The memorandum further explained the use variance proceedings prompted a review of "the characteristics of the [MEPT] property and surrounding area," which led to "a reconsideration, during the drafting of the [Master Plan Update], of all properties included within the Commercial Corridor Planning Area designation of the 2004 NJMC Master Plan." This reconsideration resulted in "the proposed 2020 Land Use Plan," in which other properties "in the vicinity of, but without direct access to, Paterson Plank Road"

"were changed from the 2004 [NJMC] Master Plan's designation within the Commercial Corridor Planning Area to other Planning Areas."

Per the NJSEA, the new "designations were based on changes in the existing land use patterns since 2004." The memorandum emphasized "[p]roperties with existing or potential future commercial development, such as the Home Depot and vacant property owned by Towers . . . were retained in the Commercial Center Planning Area," distinguishing these properties from the MEPT property in that they "collectively contain direct frontage, access, and visibility from Paterson Plank Road and/or the Route 3 ramp."

In support of its determination to apply other planning area designations to the Study Area, including the Employment Center Planning Area designation, the memorandum cited "[s]ince the adoption of the 2004 NJMC Master Plan, no land use applications have been submitted for commercial development on the MEPT site, although new commercial centers have been developed in the District" and nearby areas. Moreover, "the commercial uses that were accessory to the warehouses located on the MEPT property and the adjoining Mack warehouse property (with former Ethan Allen warehouse) were shuttered, concurrent with the close of many retail outlets in the Warehouse Outlet Center Planning Area of the 2004 [NJMC] Master Plan."

A-2868-19

Ultimately, the memorandum concluded "[w]ith the imminent opening of American Dream, . . . opportunities for new commercial development would be limited, particularly on sites with limited access, despite proximity to a regional transportation network, and that a new vision to promote economic growth in the area was needed." The memorandum noted "in addition to industrial uses, the Employment Center Planning Area could accommodate some forms of commercial usage in the form of offices, business[,] and professional services." Also, the memorandum clarified while residential uses are not envisioned, "some properties within the Employment Center classification have also been deemed suitable to accommodate housing development in an effort to promote affordability for residents and workers in the region."

Additionally, the memorandum stated the new planning area designations "were also intended to address traffic conditions in the area" as follows:

> The change of certain properties from Commercial Corridor to other designations, including Employment Center . . . will promote the development of varying uses with differing peak hours of traffic demand. The specific traffic impacts of a particular development proposal are considered during the zoning certificate application review process.
>
> [(Emphasis added).]

A-2868-19

The memorandum clarified "[w]hile the Draft [Master Plan Update] does not change the zoning designation on any property, it does form the foundation for potential changes to the District Zoning Regulations, including the Official Zoning Map, in the future."

Regarding the timeframe for a new transportation plan, the memorandum explained "NJSEA staff recognizes the importance of effective transportation planning for the District, and . . . will be providing an in-depth study and recommendations regarding the District's transportation network in the forthcoming revision to the Meadowlands District Transportation Plan." Finally, the memorandum indicated staff were "finalizing [a Request for Proposals (RFP)] for the preparation of the new Meadowlands District Transportation Plan update, and anticipate[d] completion/adoption of the plan by early 2022."

The Committee's Veto

Thereafter, in September 2019, the NJSEA submitted the Master Plan Update to the Committee, which, at a meeting held on January 13, 2020, voted to reject it.[15] The NJSEA's President and CEO, Vincent Prieto, then forwarded

---

[15] Evidently, it did so because although it asked for more time to conduct its review, the NJSEA would not agree.

A-2868-19

a memorandum to the Committee addressing comments from Committee members made during its meeting. In response to the Committee's concerns about the lack of a transportation plan, the memorandum stated that "the preparation of a transportation plan is not a mandated requirement of a Master Plan for the [District] per N.J.S.A. 5:10A-10, but is required pursuant to a separate statute altogether," the HMTPDA. The memorandum explained that "[t]he existing 2007 Meadowlands District Transportation Plan will be updated over the next two years through a consultative planning process" and that "[a]n RFP has been issued by the NJSEA."[16] It also stated the HMTPDA "requires that the District Transportation Plan be consistent with the District Master Plan [N.J.S.A. 5:10A-73(a)], and as such is not a prerequisite to the preparation of a Master Plan." (Alteration in original).

Additionally, the memorandum explained the Master Plan Update "properly provides a general overview of the complex transportation system in the District, and provides updated goals and objectives relative to transportation issues." In turn, "[t]hese objectives, including detailed improvement plans and prioritization of projects, are to be evaluated in detail in the forthcoming

---

[16] On April 23, 2020, the NJSEA passed a resolution authorizing its entry into a contract for the preparation of the District Transportation Plan Update.

A-2868-19

[District Transportation Plan Update], which will serve to implement the goals and objectives of the Master Plan Update." At that point, NJSEA staff will review "traffic impact reports" and other transportation data and engage in a dialogue with "other governmental entities having jurisdiction."

### The NJSEA's Adoption of the Master Plan Update 2020

Despite the Committee's rejection, on February 6, 2020, the NJSEA's Board of Commissioners voted unanimously to adopt the Master Plan Update as "the primary comprehensive planning document" for the District upon concluding it "will set the pathway for the continued expanded economic growth and environmental preservation objectives" for the District.

In its memorializing resolution, the NJSEA stated that, after the Committee rejected the update, it "reviewed the entire record" and concluded "action on this matter [would] be taken notwithstanding rejection by the [Committee], as the issues raised by [it] have been properly addressed during the public process described herein." This appeal followed.

## II.

### A.

Our review of administrative actions is limited. In re Proposed Xanadu Redev. Project, 402 N.J. Super. 607, 640 (App. Div. 2008). We "may reverse

A-2868-19

an agency decision if it is arbitrary, capricious, or unreasonable." In re Proposed

Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 385 (2013).

> It is by now axiomatic that final determinations of administrative agencies will not be upset absent a showing that the decision was arbitrary, capricious or unreasonable, or that it violated legislative policies expressed or implied in the act that governs the agency. A party who challenges them bears the burden of making such a showing. Furthermore, courts have a strong inclination to defer to agency action provided it is consistent with the legislative grant of power.
>
> [In re Hartz/Damascus Bakery, Inc., 404 N.J. Super. 49, 68 (App. Div. 2008) (citation and internal quotation marks omitted).]

In determining the validity of an agency's actions, we consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Proposed Quest Acad., 216 N.J. at 385-86 (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

"A strong presumption of reasonableness accompanies an administrative

agency's exercise of statutorily-delegated responsibility." In re Xanadu, 402

N.J. Super. at 632 (quoting Gloucester Cnty. Welfare Bd. v. State Civ. Serv.

Comm'n, 93 N.J. 384, 390 (1983)). For that reason, we are "mindful of, and deferential to, 'the agency's expertise and superior knowledge of a particular field'.'" Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018) (quoting Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009)). Nevertheless, "judicial review of [the NJSEA's] master planning action is available, but only where there is a charge of arbitrariness or illegality." Kelly v. Hackensack Meadowlands Dev. Com., 172 N.J. Super. 223, 228 (App. Div. 1980).

Having said that, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." In re Carter, 191 N.J. 474, 483 (2007) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)). We will, however, generally "afford substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing." Patel v. N.J. Motor Vehicle Comm'n, 200 N.J. 413, 420 (2009) (quoting Richardson v. Bd. of Trs., 192 N.J. 189, 196 (2007)). Substantial deference must be extended to an agency's interpretation of its own regulations, particularly on technical matters within the agency's expertise. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004).

A-2868-19

B.

Applying our deferential standard of review, we begin by addressing Towers's assertion that the Master Plan Update was deficient because it did not contain a regional transportation study prior to the NJEA's adoption of the plan. We conclude there was no such requirement.

By its plain language,[17] the HMACA dictates the <u>required</u> elements of the comprehensive District Master Plan.  They are (1) issuance of "a report presenting the objectives, assumptions, standards, and principles, as set forth in the master plan" that "shall be a composite of . . . written proposals recommending the physical development of the lands within the district, in its entirety or a portion thereof," prepared by the NJSEA following consultation "with any federal or State agency having an interest in the district"; (2) consideration of "existing patterns of the development in constituent municipalities"; and (3) "provisions or criteria for the location and use of

---

[17] "The starting point of all statutory interpretation [is] the language used in the enactment." <u>Kaminskas v. Off. of Att'y Gen.</u>, 236 N.J. 415 (2019) (alteration in original) (quoting <u>N.J. Div. of Child Prot. & Permanency v. Y.N.</u>, 220 N.J. 165, 178 (2014)).  "If the Legislature's intent is clear from the statutory language and its context with related provisions," courts must "apply the law as written." <u>Shelton v. Restaurant.com, Inc.</u>, 214 N.J. 419, 429 (2013).  Courts may "turn to extrinsic tools to discern legislative intent . . . only when the statute is ambiguous, the plain language leads to a result inconsistent with any legitimate public policy objective, or it is at odds with a general statutory scheme." <u>Ibid.</u>

A-2868-19

buildings, structures, facilities, and land for solid waste disposal and recycling." N.J.S.A. 5:10A-10(a) to -10(e). The record demonstrates the Master Plan Update satisfied these three requirements, and Towers does not argue otherwise.

Nevertheless, Towers argues the adopted Master Plan Update failed to include required information about land use and transportation. However, contrary to Towers's assertion, N.J.S.A. 5:10A-10(e) states provisions for those items can be included, but are not mandatory. Specifically, the statute states a masterplan

> <u>may include</u> provisions for:
>
> (1) <u>the use of land and buildings</u>, residential, commercial, industrial, park, and other like purposes;
>
>      . . . .
>
> (3) <u>transportation</u>, streets, parking, public transit lines and stations, both above and below ground level, freight facilities, airports, harbors, channels, docks, and wharves, and other like matters.
>
> [(Emphasis added).]

The plain language of the statute makes clear that there was no requirement imposed for the inclusion of a transportation study. See <u>Aponte-Correa v. Allstate Ins. Co.</u>, 162 N.J. 318, 325 (2000) ("Under the 'plain meaning' rule of statutory construction, the word 'may' ordinarily is permissive and the

A-2868-19

word 'shall' generally is mandatory," and when they both appear in a statute "it is presumed that the lawmaker intended to distinguish between them.").

Similarly, no provision in the HMACA requires the NJSEA to adopt an updated District Transportation Plan or to conduct a regional transportation study before it adopted the District Master Plan. Nonetheless, Towers relies upon the HMACA's preamble, which states, in part:

> There are several vital components necessary for the continuation and expansion of the comprehensive plan for the economic development growth of the Hackensack Meadowlands. Among them are infrastructure improvements, <u>transportation</u>, tourism, the completion of the development of the sport complex site, the delivery of municipal services, flood control, and the continuance of the Intermunicipal Tax Sharing Program, which is the fiscal underpinning of the district's master plan.
>
> [N.J.S.A. 5:10A-2(c) (emphasis added).]

While it is correct that "[a] court may turn to a statute's preamble as an aid in determining legislative intent," it is equally true that the preamble "should be read in harmony with the statute that it introduces, whenever possible." DiProspero v. Penn, 183 N.J. 477, 496 (2005). "To the extent that the preamble is at variance with the clear and unambiguous language of the statute, the preamble must give way." Id. at 497. Courts "will not labor . . . to find a conflict

between the Legislature's findings[,] declarations[,] . . . and the [statute's] text." Id. at 498.

The plain language of N.J.S.A. 5:10A-2(c) lists some of the vital components necessary for "the continuation and expansion of the comprehensive plan for economic development growth" in the District. It does not dictate the required elements for inclusion in the District Master Plan, nor does it require adoption of a District Transportation Plan or completion of a regional transportation study prior to adoption of the District Master Plan. Even assuming, as Towers contends, that the preamble purported to set forth additional required elements for the District Master Plan, it "must give way" to the "clear and unambiguous language of" N.J.S.A. 5:10A-10. See DiProspero, 183 N.J. at 497.

Furthermore, the plain language of the HMTPDA, enacted on the same day as HMACA, supports the conclusion that adoption of an updated District Transportation Plan is not a prerequisite to adoption of the Master Plan Update. See L. 2015, c. 19, §§ 1 to 81. The HMTPDA provides that the District Transportation Plan "shall be consistent with the master plan adopted by the [NJSEA] pursuant to section 10 of [the HMACA]" and "shall be based on a

A-2868-19

reasonable assessment of likely future growth reflected in that master plan." N.J.S.A. 5:10A-73(a).

In considering the meaning of the two statutes, we apply well settled rules of construction. "When, as here, two related statutes are relevant to the disposition of a matter, they 'should be read in pari materia and construed together as a unitary and harmonious whole.'" State v. Nance, 228 N.J. 378, 395 (2017) (quoting Nw. Bergen Cnty. Utils. Auth. v. Donovan, 226 N.J. 432, 444 (2016)). "The Legislature is presumed to be familiar with its own enactments . . . and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose." Nw. Bergen Cnty. Utils. Auth., 226 N.J. at 444 (quoting State v. Federanko, 26 N.J. 119, 129 (1958)). "And the courts have the duty of reconciling them so as to give effect to both expressions of the lawmakers' will." Ibid. (emphasis omitted) (quoting Federanko, 26 N.J. at 130).

Applying those rules, we conclude the clear and unambiguous plain language indicates that the Master Plan Update must predate any updates to the District Transportation Plan. If the new District Transportation Plan had been completed first, it would have been impossible for it to comply with the HMTPDA's requirement that it "be consistent with" and "be based on a

42

reasonable assessment of likely future growth reflected in" the Master Plan Update. N.J.S.A. 5:10A-73(a). It would be illogical, and contrary to the doctrine of in pari materia, to interpret this provision any other way.

We are not persuaded otherwise by Towers's reliance on Brennan's expert report to support its contention that NJSEA should have conducted a regional transportation study prior to adopting the Master Plan Update. "It is the exclusive province of the court to decide questions of law, such as the interpretation of a statute." Kamienski v. State, Dep't of Treasury, 451 N.J. Super. 499, 518 (App. Div. 2017). "An expert's opinion on a question of law is neither appropriate nor probative." Ibid. As Towers concedes in its brief, "[t]he central issue presented" in this appeal is a question of law: whether NJSEA "properly fulfilled its statutory mandates while drafting, considering[,] and ultimately adopting" the Master Plan Update.

Towers's reliance on Meadowlands Regional, 119 N.J. Super. at 574, is also unavailing. That appeal involved "the constitutionality of certain temporary zoning regulations adopted by the Hackensack Meadowlands Development Commission" as part of a "first stage master plan as opposed to a final plan." Id. at 573-74. We affirmed the constitutionality of the regulations. Id. at 578.

43

In adopting the interim zoning and first stage of the master plan in a piecemeal fashion as permitted by then-controlling law, the Commission explained that "[t]he preparation of a Master Plan containing the components enumerated in the Meadowlands Act cannot be accomplished in a short time" and that "[c]omprehensive studies have to be undertaken to enable the Commission to plan intelligently and effectively." Id. at 574.

This general statement was made not by our court but by a prior Commission charged with planning in the District, before enactment of the HMACA or the HMTPDA. Nothing in the Meadowlands Regional opinion leads us to conclude that the NJSEA must adopt a District Transportation Plan or complete other transportation-related studies in connection with the Master Plan Update, particularly considering the plain language of the HMACA and the HMTPDA discussed above.

In sum, the Master Plan Update is a comprehensive plan, as required by the HMACA. The fact that the NJSEA adopted the Master Plan Update before finalizing the new District Transportation Plan or considering a regional transportation study does not render the agency's action arbitrary, capricious, or unreasonable because neither the HMACA nor the HMTPDA require the District Transportation Plan to be adopted first.

44

C.

Next, we consider Towers's contention that the Employment Center Planning Area classification was "overly broad," "counter to good planning practices," and, therefore, arbitrary and capricious. Towers asserts that our holding in Kelly, 172 N.J. Super. at 229, requires our reversal of the NJSEA's adoption of the Master Plan Update. We disagree.

At the outset, we observe that the record "contains substantial evidence to support the findings on which the agency based its action" pertaining to its creation of the Employment Center Planning Area. In re Proposed Quest Acad., 216 N.J. at 385 (quoting Mazza, 143 N.J. at 25). Conversely, it does not support a finding that the NJSEA "clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors" or "violate[d] express or implied legislative policies." Ibid.

The NJSEA offered a reasoned explanation for its decision to adopt the Master Plan Update, including its reasoning for reclassifying the MEPT property as an Employment Center Planning Area, which was that "a new vision to promote economic growth in the area was needed" because, "[w]ith the imminent opening of American Dream, . . . opportunities for new commercial

45

development would be limited, particularly on sites with limited access, despite proximity to a regional transportation network."

Moreover, the NJSEA's use of the Employment Center Planning Area was consistent with its review of land use in the District since 2004 and related data, which found that: (1) industrial use comprised the largest active land use category in the District (16.2%); (2) the District was "a mecca for the Industrial sector, particularly for warehouse and distribution facilities" given its proximity to major transportation routes, ports, airports, and freight rail facilities; and (3) the "share of District land area occupied by industrial uses is anticipated to increase in the coming years" based on historical and proposed new development and expansion of warehouse space in the District.

As noted, the Commercial Corridor and Commercial Center Planning Areas did not permit the construction of warehouse or distribution facilities, while the Employment Center Planning Area does. In 2018, before it issued the Draft Master Plan Update, the NJSEA granted MEPT's application for a use variance to construct a new warehouse and distribution facility on the MEPT property, which we affirmed. In re Use Variance Application, slip op. at 2. The NJSEA's reclassification of the MEPT property into the Employment Center Planning Area is consistent with that decision.

The NJSEA explained, as of 2004, the MEPT property and others were placed in the Commercial Corridor Planning Area "in recognition of the commercial development that had occurred along the Paterson Plank Road corridor since the adoption of the 1970 Comprehensive Land Use Plan." In other words, it classified the property "based on the character of the predominant land uses in the vicinity." However, since that time, industrial use has become the predominant land use in the District.

The use variance proceedings prompted the NJSEA to review "the characteristics of the [MEPT] property and surrounding area," which led to "a reconsideration, during the drafting of the [Master Plan Update], of all properties included within the Commercial Corridor Planning Area designation of the 2004 NJMC Master Plan." The reclassification of several properties in the District was prompted by "visibility, access, and/or circulation constraints that affect the feasibility of accommodating commercial uses on these properties." Ultimately, NJSEA staff decided the MEPT property, located "in the vicinity of, but without direct access to, Paterson Plank Road," would be newly designated as part of the Employment Center Planning Area.

The NJSEA distinguished the MEPT property from the Towers property with the Home Depot and vacant lot as those areas contained "direct frontage,

access, and visibility from Paterson Plank Road and/or the Route 3 ramp." It cited that, since 2004, "no land use applications have been submitted for commercial development on the MEPT site," and that "the commercial uses that were accessory to the warehouses located on the MEPT property and the adjoining Mack warehouse property . . . were shuttered."

In addition, cognizant of its review of "traffic studies prepared by public and private transportation planning organizations" regarding peak travel times in the District, the NJSEA determined that the Employment Center Planning Area "will promote the development of varying uses with differing peak hours of traffic demand" and recognized that "[e]mployment centers have been adept at adapting to current market conditions." Its conclusion was grounded in supporting evidence.

In its argument before us, Towers misconstrues language from our opinion in Kelly and removes it from its original context. Kelly is factually distinguishable from the present matter because it involved the Hackensack Meadowlands Development Commission's rezoning of 460 acres of land located in the District as set forth in a "comprehensive set of amendments" to the District's original master plan. 172 N.J. Super. at 225-26. The various appellants in that case contended "the substance of the amendments was

arbitrary or irrational." Id. at 229. We rejected those claims and held "rational reasons were presented for all of the [forty-seven] amendments and nothing presented by appellants overc[ame] that presumptive rationality." Id. at 230.

In reaching our decision, we cited to Bow & Arrow Manor, Inc. v. Town of West Orange, 63 N.J. 335, 345 (1973), which expressed "the standard generally applicable to review of the exercise of municipal zoning power," and quoted the following passage from that opinion:

> It is fundamental that zoning is a municipal legislative function, beyond the purview of interference by the courts unless an ordinance is seen in whole or in application to any particular property to be clearly arbitrary, capricious[,] or plainly contrary to fundamental principles of zoning or the statute . . . . It is not the function of the court to rewrite or annul a particular zoning scheme . . . merely because the court would have done it differently or because the preponderance of the weight of the expert testimony adduced at trial is at variance with the local legislative judgment. If the latter is at least debatable, it is to be sustained.
>
> [Kelly, 172 N.J. Super. at 229 (omission in original) (quoting Bow & Arrow, 63 N.J. at 343).]

We "regard[ed] these principles as applicable in determining the validity of [the] HMDC master plan action," which involved rezoning, and concluded that we were "satisfied that the appellants have not borne their heavy burden of demonstrating the invalidity of the amendments." Ibid. Based upon this

language deeming the principles in <u>Bow & Arrow</u> "applicable," Towers contends <u>Kelly</u> "expressly stated that master plan actions can be invalidated if they are 'arbitrary, capricious[,] or plainly contrary to fundamental principles of zoning or the statute.'" (Emphasis omitted). However, not all master plan actions involve rezoning, as was the case in <u>Kelly</u>.

Here, the NJSEA's use of the Employment Center Planning Area classification as part of the Master Plan Update was not rezoning. The NJSEA explained that "[p]lanning areas do not constitute zoning districts; rather, the descriptions of the Planning Areas provide the basis for the development of an updated zone plan and regulations" and that the "Land Use Plan does not change the zoning designations on any property."

Although Towers asserts the Employment Center Planning Area is overly broad and "will 'hinder' zoning regulations" because it "encompasses many different land uses with different operating characteristics," such as offices, distribution facilities, and potentially housing; this contention is premature, speculative, and lacks legal support. Again, issues pertaining to zoning are not yet ripe, as the use of the Employment Center Planning Area classification does not constitute rezoning. As the NJSEA explained, individual attributes of a specific development proposal, including its "specific traffic impacts . . . are

considered during the zoning certificate application review process," not as part of adopting a Master Plan Update which the NJSEA did here. In any event, the NJSEA explained in detail changes that occurred in the District since 2004, including the opening of one of the largest malls in the country and a major shift in the District to industrial and warehouse related commerce. Its reasons for its anticipated redesignation of the area where the MEPT property was located are unassailable.

III.

Next, we consider Towers's contention that the reclassification of the area where the MEPT property is located "is simply a form of spot zoning." It also argues that by reclassifying the MEPT property, the "NJSEA hindered their own objectives within the [Master Plan Update]," which include stimulating job growth and economic prosperity, promoting a regional transportation network that improves mobility in the District, and promoting Complete Streets principles. We find these arguments also to be without merit.

As noted, the Commercial Corridor and Commercial Center Planning Areas did not permit the construction of warehouse or distribution facilities, while the Employment Center Planning Area does. In 2018, before it issued the Draft Master Plan Update, the NJSEA granted MEPT's application for a use

51

variance to construct a new warehouse and distribution facility on the MEPT property, which we affirmed. In re Use Variance Application, slip op. at 2. The NJSEA's reclassification of the MEPT property into the Employment Center Planning Area is consistent with that decision.

We find unavailing Towers's contention that the reclassification was "simply a form of spot zoning." In determining whether an ordinance constitutes impermissible spot zoning, courts ask "whether the particular provision of the zoning ordinance is made with the purpose or effect of furthering a comprehensive scheme or whether it is designed merely to relieve a lot or lots from the burden of a general regulation." Riya Finnegan LLC v. Twp. Council of S. Brunswick, 197 N.J. 184, 196 (2008) (emphasis added) (quoting Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 134 (1965)). Enacting an ordinance proposed by and benefitting a private party is not impermissible spot zoning if it was enacted for the general welfare as part of a comprehensive plan. Taxpayer Ass'n of Weymouth Twp, Inc. v. Weymouth Twp., 80 N.J. 6, 18 (1976); see also Gallo v. Mayor and Twp. Council, 328 N.J. Super. 117, 128 (App. Div. 2000) (rejecting argument that re-zoning a property to allow higher density for development by a private party was impermissible spot zoning considering it was consistent with a comprehensive plan to benefit the community and was not

enacted to benefit only certain individuals).  "The final test [is] whether the [zoning] . . . advance[s] the community interest rather than some private or sectional advantage."  Kozesnik v. Montgomery Twp., 24 N.J. 154, 172 (1957).

Applying this understanding of "spot zoning," we discern that none occurred here.  As already noted, although it is anticipated later, the reclassification itself does not constitute a zoning change.  In any event, there was substantial evidence in the record to support the NJSEA's conclusion that the proposed reclassification was for the benefit of the entire District and not just the owners of the MEPT Property, who already received a variance regardless of the reclassification.  We need not say more.  R. 2:11-3(e)(1)(D).

Finally, there is no evidence, as Towers contends, that reclassifying the MEPT property negatively impacted NJSEA's "objectives" that included stimulating job growth and economic prosperity, promoting a regional transportation network that improves mobility in the District, and promoting Complete Streets principles.

Contrary to Towers's contention, reclassification of the MEPT property comports with the Master Plan Update's objective to stimulate job growth and economic prosperity in the District.  While Towers claims that a retail use at the MEPT property would create more jobs per square foot, a warehouse and

distribution facility would also create jobs in the District—now known as a mecca for industrial use. The increased industrial use in the District since 2004, coupled with the fact that "no land use applications have been submitted for commercial development on the MEPT site" since 2004, supports the NJSEA's reclassification of the MEPT property as a means to stimulate job growth and economic prosperity in the District.

Concerning the objective to promote a regional transportation network that improves mobility in the District, the NJSEA candidly acknowledged the challenges it faces pertaining to this objective considering the District's roadways are "among the most heavily traveled in the nation." It reviewed traffic volume data from the DOT, various traffic studies, albeit not current, and determined when peak traffic volume occurred in the District.

With that data in mind, the NJSEA reasoned that the reclassification would "encourage a mix of uses within the area with varying peak hours of travel in an effort to minimize new traffic impacts." In that way, the reclassification supports a regional transportation network that improves mobility. The NJSEA also cited the ongoing MASSTR project, which "incorporates all of the Meadowlands region's traffic signals into a network of self-adaptive traffic signals to efficiently reduce roadway congestion, delay, travel time, fuel

consumption, and airborne emissions," as another means of supporting the regional transportation network and improving mobility. It also committed to updating the District Transportation Plan, undertaking traffic studies, and identifying land use impacts upon the capacity of the regional transportation network going forward.

Additionally, during the use variance proceedings, the NJSEA required MEPT to "produc[e] a plan to reconfigure the Daffy's Way driveway for enhanced two-way traffic flow to reduce the potential for conflicting movements between vehicles travelling in opposite directions." In re Use Variance Application, slip op. at 6. Also, although the NJSEA admits increased emphasis on the Complete Streets principles is needed to ensure safe walking and biking in the District, Towers concedes there will be a "pedestrian accommodation" on the MEPT property, that is, a "sidewalk along the curb line of Daffy's Way."

IV.

We turn our attention to Towers's contention that the NJSEA "has admitted the land use classification change was made in order to moot Towers'[s] [then-]pending appeal against [the] NJSEA's grant of a use variance," which interfered with Towers's due process rights as they related to its appeal from the use variance granted for that property.

We conclude Towers's argument in this regard is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Suffice it to say, contrary to Towers's contention, the Master Plan Update had no bearing on the appellate process as it pertained to the use variance. Despite the reclassification, a use variance is still required to allow construction of a warehouse and distribution facility on the MEPT property unless the District zoning regulations are changed. Although ultimately unsuccessful, Towers's appeal proceeded, and its due process rights were not undermined.

V.

As already noted, Towers filed a motion asking that we take "judicial notice of the materials contained in Towers'[s] [s]upplemental [a]ppendix." We deny that request.

"Judicial notice has been defined as the cognizance of certain facts which judges and jurors may properly take and act upon without proof, because they already know them." State v. Silva, 394 N.J. Super. 270, 274 (App. Div. 2007) (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 201 (2007)). "The rules regarding judicial notice are designed solely to provide a speedy and efficient means of proving matters which are not in

genuine dispute."  RWB Newton Assocs. v. Gunn, 224 N.J. Super. 704, 711 (App. Div. 1988).

N.J.R.E. 202(b) states "[t]he reviewing court may take judicial notice of any matter specified in [N.J.R.E.] 201, whether or not judicially noticed by the trial court."  Per N.J.R.E. 201(b), "[t]he court may judicially notice" the following categories of facts:

> (1)  such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute;
>
> (2)  such facts as are so generally known or are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute;
>
> (3)  specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned; and
>
> (4)  records of the court in which the action is pending and of any other court of this state or federal court sitting for this state.

Towers contends the documents at issue, which total more than four hundred pages, "are public documents that Towers acquired from OPRA requests or were public records in prior litigation between Towers and MEPT" Those documents include:  (1) the 1992 REA for Daffy's Way; (2) MEPT's use variance application; (3) the NJSEA public hearing transcripts from May 2018

pertaining to the use variance; (4) the NJSEA resolutions pertaining to the use variance; (5) documents related to Towers's OPRA requests; (6) traffic data from the intersection of Paterson Plank Road and Daffy's Way; and (7) a certification stating MEPT sold the MEPT property to another entity in August 2020.

While the facts contained in the documents may be known to the parties, they do not contain generalized knowledge that is universally known. For the most part, they pertain to very specific aspects of the REA, the use variance application, and Towers's OPRA requests. As for any documents that were part of the record in In re Use Variance Application, slip op. at 2-13, which includes the traffic data, there is no need for us to consider them. That appeal has already been adjudicated, and we can take judicial notice of the contents of our opinion.

Furthermore, none of the documents are directly relevant to the central issue raised by this appeal: whether the NJSEA comported with its statutory obligations when it adopted the Master Plan Update or acted arbitrarily, capriciously, or unreasonably. There is no need to consider proofs pertaining to the REA, the use variance application, or Towers's OPRA requests to adjudicate this appeal. And the fact that MEPT recently sold the MEPT property has no bearing on the outcome of this appeal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

58

A-2868-19